37318. CAFFO v. THE STATE.

GREGORY, Justice.

Michael Caffo was convicted of the murder of Leslie Bower by a Chatham County jury and sentenced to life imprisonment. The following evidence was presented at trial.

On March 25, 1979 the victim, a horsetrainer, came to Savannah to visit a childhood friend, June Carpenter. The victim declined Miss

---

[2] Ga. L. 1975, pp. 1008, 1010; Code Ann. § 68B-101 (b) (3).

Carpenter's invitation to spend the night as she needed to be at a race track in Aiken, South Carolina, by 4:30 the following morning. The victim began her return trip to Aiken at approximately 8:00 p.m.

On March 26, 1979 police officers found the victim's car abandoned in an area off of Silk Hope Road, approximately 2/10 mile from the DeSoto Truck Stop, in Chatham County. The trunk had been pried open and the license plate removed. The victim's purse was found in the trunk with her wallet missing. The victim's checkbook was found on the front seat, as was a letter to the victim from June Carpenter. As police officers were inspecting the victim's car, the defendant, who worked at the DeSoto Truck Stop, drove by and stopped to talk to the investigating officers. When asked by the officers if he had seen the victim's car before, the defendant responded that he had not been in that area for about a month. The defendant then stated that his girlfriend lived on Silk Hope Road and that he was on his way to visit her. Police officers discovered later that the defendant's girlfriend had moved to California nearly three months before the victim's death.

On March 27 one of the detectives investigating the victim's abandoned car stopped for lunch at the DeSoto Truck Stop. The defendant volunteered to the detective that, two days earlier, a woman driving a car similar to the victim's had driven into the truck stop and asked for directions to Aiken, South Carolina. The defendant stated that the woman closely resembled the picture of Leslie Bower which had accompanied an article in the local newspaper relating her disappearance. Pursuing this lead, the police later interviewed the defendant as a witness in the case. At that time the defendant stated that on March 25 he had been filling two large trucks with gas when the victim drove in and began to ask one of the truck drivers for directions. The defendant stated that he interceded and gave the victim the directions she requested. The defendant informed the officer that the victim did not get out of the car, but left the station and headed north on U. S. 17. The defendant stated that immediately thereafter a car with two white men pulled out of the DeSoto with "tires squealing" and "tore after" the victim's car. An examination of the DeSoto's receipts for March 25 led the police to one of the truck drivers, Ronald Burns, who had been at the truck stop while the victim was there. Burns stated that the woman seeking directions had gone inside the truck stop; however, Burns was unable to positively identify a photograph of Leslie Bower as the woman he had seen at the DeSoto on the night of March 25. Burns stated that when he left the DeSoto this woman was still inside, getting directions from the defendant.

On March 31 the victim's body was discovered floating under a

bridge by a group of fishermen. The victim's slacks were down around her ankles and her underpants were around her thighs. A wire and the carcass of a racoon were entangled in her hair and a plastic Panduit-brand strap was fastened about one of her legs.

The medical examiner who performed the autopsy testified at trial that while the cause of death could not be conclusively determined, "some kind of strangulation" was most consistent with death. He stated that while he could not rule out the possibility that the victim had drowned, he did not think this had happened. The medical examiner testified that he found no evidence of a sexual assault on the victim.

A search warrant was issued to search the defendant's living quarters at the DeSoto Truck Stop. Police officers found a road Atlas which was later established, by the impression of a phone number on the cover, to belong to the victim, under the mattress of the defendant's bed. The defendant maintained that he had owned the Atlas for three or four years and that he kept it under his mattress because he feared it being stolen. A quilt, which the defendant later stated he had removed from the victim's car, was found in the attic above the defendant's room. A number of Panduit straps were found on the dashboard of the defendant's car.

Palm prints and fingerprints established to be those of the defendant were lifted from the exterior of the victim's car.

In a statement made to police after his arrest, the defendant admitted that he had grabbed the victim's wrist while they were alone in the truck stop; that she fainted and he dragged her into the hallway; that when she revived, she pulled a knife on him, at which time he grabbed her about the throat; that he bound her hands and feet and placed her in the trunk of her car. The defendant stated that he believed her to be unconscious when he threw her in the river.

The defendant defended on the basis of insanity. Evidence was introduced at trial that the defendant had, on a number of occasions, been confined to Central State Hospital at Milledgeville; that he was borderline mentally retarded, had never progressed past the 4th grade, and that he had been subjected to great physical and psychological abuse as a child by his stepmother. Defendant's counsel put into evidence that the defendant had previously been convicted of aggravated assault with intent to rape and had served two years for this offense. Shortly after his release from prison he was charged with rape and found not guilty by reason of insanity. The evidence indicated that the defendant had attempted suicide on several occasions and was prone to periods of inexplicable rage, after which he seemed not to remember what actions he had taken.

In rebuttal the State produced a psychiatrist from Central State

Hospital who testified that the defendant was able to distinguish right from wrong. The psychiatrist further testified that his examination of the defendant revealed no evidence of psychosis.

(1) The defendant first argues that the trial court erred in denying his motion for new trial based on the general grounds. Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the defendant guilty of murder beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Smith v. State,* 245 Ga. 44 (262 SE2d 806) (1980); *Driggers v. State,* 244 Ga. 160 (259 SE2d 133) (1979); *Potts v. State,* 241 Ga. 67 (243 SE2d 510) (1978).

(2) Defendant complains that the trial court erred in denying his motion to suppress evidence seized during the search of defendant's room and automobile because the "search warrant was obtained by a legally insufficient affidavit."

(a) Defendant contends that the warrant failed to describe the places to be searched and the items to be seized as required by United States v. Rabinowitz, 339 U. S. 56 (70 SC 430, 94 LE 653) (1950). However, the search warrant clearly specifies that the defendant's room at the DeSoto Truck Stop and his brown Dodge Dart were to be searched. The warrant indicates the address of the former and the license number of the latter. Furthermore, the warrant listed seven specific items belonging to the victim which officers expected to find during the search. Therefore, there is no merit to this contention.

(b) Defendant next argues that the facts alleged in the affidavit supporting the search warrant fail to "raise a suspicion as to the [defendant]." Citing Spinelli v. United States, 393 U. S. 410 (89 SC 584, 21 LE2d 637) (1969) the defendant urges that "probable cause cannot be based on facts which are totally innocent in themselves."

A lengthy affidavit of the officer in charge of investigating the case was used in support of the search warrant. It details each step of the investigation, enumerating inconsistencies in defendant's statement as compared to that of a witness; the facts showing that the defendant saw the victim on the night of her disappearance, near the place where her vehicle was later found; that Panduit straps, similar to the one found on the victim's body had been observed, during the course of the investigation, on the dash of the defendant's car; and defendant's prior criminal record.

We conclude that the information in the affidavit presented to the magistrate was specific and provided a sufficient basis for finding probable cause. "Local law enforcement officers participating in a common investigation are reliable informants." Brooks v. United States, 416 F2d 1044, 1049 (5th Cir. 1969). Information provided by police officers, arising out of an official investigation, may be used to

establish probable cause for a search warrant. *Pollard v. State,* 236 Ga. 587 (224 SE2d 420) (1976). See also United States v. Ventresca, 380 U. S. 102, 111 (85 SC 741, 13 LE2d 684) (1964).

(c) Defendant argues that Spinelli v. United States, supra, prohibits use of a suspect's past criminal conduct to support probable cause to issue a search warrant. Therefore, he urges, the magistrate was not entitled to rely on his criminal record in determining whether to issue the search warrant in this case. However, in United States v. Harris, 403 U. S. 573, 583 (91 SC 2075, 29 LE2d 723) (1971), the court stated "[w]e cannot conclude that a policeman's knowledge of a suspect's reputation . . . is not a 'practical consideration of everyday life' upon which an officer (or a magistrate) may properly rely . . . To the extent that Spinelli prohibits the use of such probative information, it has no support in our prior cases, logic, or experience and we decline to apply it to preclude a magistrate from relying on a law enforcement officer's knowledge of a suspect's reputation."

(d) The search warrant was issued on April 6, 1979, twelve days after the disappearance of the victim. Defendant argues that this "interval between the alleged crime and the request to search is of such a long duration as to prevent a finding of probable cause that the items sought in the warrant would be found at [the defendant's] residence."

" 'Staleness' as relates to probable cause is not always measured by the interval between the commission of the crime and the issuance of the search warrant. 'Staleness' as relates to probable cause is measured by the probability that the thing to be seized is located at the place to be searched and it involves the interval between (i) the time when the thing to be seized is indicated by the evidence or information to be at the place to be searched and (ii) the time when the search warrant is issued." *Mitchell v. State,* 239 Ga. 456, 458 (238 SE2d 100) (1977). We cannot say that the information in the affidavit was so stale as to make it unlikely that a number of personal belongings of the victim's or the Panduit straps would be found in the defendant's room or car at the time the search warrant was executed.

We conclude that the affidavit was sufficient to authorize the issuance of the search warrant. Therefore, the trial court did not err in denying the defendant's motion to suppress.

(3) Last, defendant argues that the trial court erred in the finding that his statements, made to police officers shortly after being arrested, were freely and voluntarily made. Defendant contends that the police officers were aware of his past mental problems and preyed on his instability in order to exact the desired responses to their questions. Further, defendant alleges that statements by the officers that defendant would feel "better if he confessed and rid himself of

the burden . . . which must be on his mind," were inducements to confess by "hope of benefit" in violation of Code Ann. § 38-411.

After searching his room pursuant to a search warrant, investigating officers placed the defendant under arrest and read him Miranda warnings while still at the truck stop. Upon arrival at the police station, the defendant was again advised of his Miranda rights. After a few preliminary questions, the defendant indicated that he did not wish to speak without an attorney. The interview immediately terminated and the defendant was taken to the holding cell. During this time the defendant's father, a county police officer, had been notified of his son's arrest. The defendant's father briefly visited his son in the jail; thereafter the defendant requested that the interview recommence.[1] Defendant was again advised of his Miranda rights. The police officers taped the interview with defendant which was played for the jury at trial.

The defendant indicated that he understood his rights and signed a waiver form. Subsequently the defendant admitted that he had grabbed the victim by the throat, bound her hands and legs, and then dumped her into the river.

The defendant argues that the following statements made by the interviewing officer offered him a "hope of benefit" which induced him to confess. "Lay it out, Mike . . . get it off your chest. I know it's hurting you. I know how you feel . . . Don't try to pressure yourself too hard now. I know it's a heavy load to get off, but you're going to feel better when you do . . ."

Code Ann. § 38-411 provides: "[t]o make a confession admissible, it must have been made voluntarily, without being induced by another, by the slightest hope of benefit or remotest fear of injury."

---

[1] While not raised by the defendant, we have compared this case to the recent United States Supreme Court decision in Edwards v. Arizona, [—— U. S. ——, 101 SC ——, 68 LE2d 378] No. 79-5269, 29 CLR 3037 (1981). There the Court reconfirmed the right of an accused under the Fifth and Fourteenth Amendments, as set out in Miranda v. Arizona, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), to have counsel present during a custodial interrogation, and held that where an accused expresses his desire to deal with police "only through counsel, [he] is not subject to further interrogation by authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." Edwards, supra, at 3039. Noting that had the defendant in Edwards initiated the second interview with police after he had originally declined to talk to them without an attorney, "nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary volunteered statements and using them against him at the trial." Id. at 3040.

A reward of lighter punishment is generally the "hope of benefit" to which Code Ann. § 38-411 refers. *Presnell v. State,* 241 Ga. 49 (243 SE2d 496) (1978), reversed on other grounds in 439 U. S. 14 (99 SC 235, 58 LE2d 207) (1978). "For an officer to advise an accused that it is always best to tell the truth will not, without more, render a subsequent confession inadmissible under Code Ann. § 38-411." *Tyler v. State,* 247 Ga. 119, 122 (274 SE2d 549) (1981); *Watkins v. State,* 199 Ga. 81 (33 SE2d 325) (1945). Nor will advice from an officer that the suspect will feel better if he tells the truth render a confession inadmissible under Code Ann. § 38-411. We cannot say that these statements by the interviewing officer were an inducement or hope of benefit or reward.

Nor do we find that the trial court erred in determining that the defendant's statements were voluntarily made and in submitting them to the jury. "Unless clearly erroneous, a trial court's findings as to factual determinations and credibility relating to the admissibility of a confession will be upheld on appeal. United States v. Watson, 469 F2d 362, 365 (5th Cir. 1972)." *Crawford v. State,* 245 Ga. 89, 90 (263 SE2d 131) (1980); *Hurt v. State,* 239 Ga. 665 (238 SE2d 542) (1977). See also, Lego v. Twomey, 404 U. S. 477 (92 SC 619, 30 LE2d 618) (1972).

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 1, 1981.

*James O. Wilson, Jr., John H. Oldfield,* for appellant.
*Spencer Lawton, Jr., District Attorney, Robert M. Hitch III, Assistant District Attorney, Arthur K. Bolton, Attorney General, Nicholas G. Dumich, Assistant Attorney General,* for appellee.