S99P0651. WILSON v. THE STATE.
(525 SE2d 339)

BENHAM, Chief Justice.

A jury convicted Marion Wilson, Jr. of malice murder, felony murder, armed robbery, hijacking a motor vehicle, possession of a firearm during the commission of a crime, and possession of a sawed-

off shotgun.[1] The jury fixed the sentence for the murder at death, finding as a statutory aggravating circumstance that Wilson committed the murder while engaged in the commission of an armed robbery. OCGA § 17-10-30 (b) (2). For the reasons that follow, we affirm.

The evidence at trial showed that on the night of March 28, 1996, the victim, Donovan Corey Parks, entered a local Wal-Mart to purchase cat food, leaving his 1992 Acura Vigor parked in the fire lane directly in front of the store. Witnesses observed Wilson and Robert Earl Butts standing behind Parks in one of the store's checkout lines and, shortly thereafter, speaking with Parks beside his automobile. A witness overheard Butts ask Parks for a ride, and several witnesses observed Wilson and Butts entering Parks's automobile, Butts in the front passenger seat and Wilson in the back seat. Minutes later, Parks's body was discovered lying face down on a residential street. Nearby residents testified to hearing a loud noise they had assumed to be a backfiring engine and to seeing the headlights of a vehicle driving from the scene. On the night of the murder, law enforcement officers took inventory of the vehicles in the Wal-Mart parking lot. Butts's automobile was among the vehicles remaining in the lot overnight. Based upon the statements of witnesses at the Wal-Mart, Wilson was arrested. A search of Wilson's residence yielded a sawed-off shotgun loaded with the type of ammunition used to kill Parks, three notebooks of handwritten gang "creeds," secret alphabets, symbols, and lexicons, and a photo of a young man displaying a gang hand sign.

Wilson gave several statements to law enforcement officers and rode in an automobile with officers indicating stops he and Butts had made in the victim's automobile after the murder. According to Wilson's statements, Butts had pulled out a sawed-off shotgun, had ordered Parks to drive to and then stop on Felton Drive, had ordered Parks to exit the automobile and lie on the ground, and had shot

---

[1] The crimes occurred on March 28, 1996. Wilson was indicted on May 29, 1996, by the Baldwin County Grand Jury for malice murder, felony murder, armed robbery, hijacking a motor vehicle, possession of a firearm during the commission of a crime, and possession of a sawed-off shotgun. The State filed written notice of its intent to seek the death penalty on July 22, 1996. Wilson's trial began on October 27, 1997, and the jury found Wilson guilty on all counts. The felony murder conviction was vacated by operation of law. *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993); OCGA § 16-1-7. On November 7, 1997, the jury recommended the death sentence for malice murder. In addition to the death sentence, the trial court imposed consecutive sentences of life imprisonment for armed robbery, twenty years in prison for hijacking a motor vehicle, five years in prison for possession of a firearm during the commission of a crime, and five years in prison for possession of a sawed-off shotgun. Wilson filed a motion for a new trial on December 3, 1997, and supplemented his motion on December 10, 1997. The trial court denied the motion for a new trial on December 18, 1997. The appeal was docketed with this Court on February 3, 1999, and orally argued on April 19, 1999.

Parks once in the back of the head. Wilson and Butts then drove the victim's automobile to Gray where they stopped to purchase gasoline. Wilson, who was wearing gloves, was observed by witnesses and videotaped by a security camera inside the service station. Wilson and Butts then drove to Atlanta where they contacted Wilson's cousin in an unsuccessful effort to locate a "chop shop" for disposal of the victim's automobile. Wilson and Butts purchased two gasoline cans at a convenience store in Atlanta and drove to Macon where the victim's automobile was set on fire. Butts then called his uncle and arranged a ride back to the Milledgeville Wal-Mart where Butts and Wilson retrieved Butts's automobile.

1. Viewed in the light most favorable to the verdict, we find that the evidence introduced at trial was sufficient to enable a rational trier of fact to find beyond a reasonable doubt that Wilson was guilty of the crimes of which he was convicted and to find beyond a reasonable doubt the existence of a statutory aggravating circumstance. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); OCGA § 17-10-30 (b) (2). The State was not required to prove that Wilson was "the triggerman" in order to prove him guilty of malice murder. Even assuming that Wilson did not shoot the victim, there is sufficient evidence that he intentionally aided or abetted the commission of the murder or that he intentionally advised, encouraged, or procured another to commit the murder to support a finding of guilt. OCGA § 16-2-20 (b) (3), (4). See *Mize v. State*, 269 Ga. 646 (1) (501 SE2d 219) (1998); *Chapman v. State*, 263 Ga. 393 (435 SE2d 202) (1993); *Gambrel v. State*, 260 Ga. 197 (391 SE2d 406) (1990).

The same standard of review of the evidence is applicable to the denial of the defendant's motion for a directed verdict. *Miller v. State*, 270 Ga. 741 (1) (512 SE2d 272) (1999); *Smith v. State*, 267 Ga. 502 (3) (480 SE2d 838) (1997). Accordingly, we disagree with Wilson's contention that his motion for a directed verdict was improperly denied by the trial court.

2. Wilson claims that his rights to freedom of speech and freedom of association were violated during the penalty phase of his trial by the introduction of evidence showing his involvement with the Folks gang.[2] In support of his contention, Wilson relies upon *Dawson v. Delaware*, 503 U. S. 159 (112 SC 1093, 117 LE2d 309) (1992), wherein the U. S. Supreme Court held that a defendant's association with a racist organization was protected by the First and Fourteenth Amendments and that evidence of such an association could not lawfully be introduced unless relevant to the issues to be tried. Presentation by the State of evidence that proves "nothing more than [a

---

[2] No such evidence was introduced during the guilt/innocence phase of the trial.

defendant's] abstract beliefs[]" (id. at 167) invites punishment of a criminal defendant's exercise of constitutionally protected rights. In the present case, however, evidence of Wilson's involvement with the Folks gang and of the violent nature of that gang was relevant to the issues to be decided by the jury during the sentencing phase of his trial. The State presented testimony that the Folks gang required its members to commit violent, criminal acts and that Wilson held a powerful position in the gang. The State also presented a tape-recorded statement of Wilson claiming to be the gang's "chief enforcer," Wilson's handwritten notebooks regarding the gang, and a photograph found in Wilson's residence of a young man displaying a gang hand sign. Because the evidence in question was not objected to at trial, Wilson is barred from challenging its introduction on appeal. *Earnest v. State*, 262 Ga. 494 (1) (422 SE2d 188) (1992).

3. Wilson contends that the trial court allowed improper expert testimony about gangs during the sentencing phase of his trial. The testimony in question was not objected to at trial and cannot now be complained of on appeal. Id.

4. Wilson claims that self-inculpatory statements allegedly made by Robert Earl Butts to three of Butts's fellow inmates were made "during the pendency of the criminal project" (OCGA § 24-3-5) in which Wilson and Butts had been engaged as co-conspirators and, therefore, that those alleged statements should have been admitted during the guilt/innocence phase of Wilson's trial. The trial court excluded the evidence on the basis that any conspiracy between Wilson and Butts ended when Wilson gave statements to law enforcement officers revealing certain details of the crime and seeking to place blame for the murder on Butts. While we agree with the trial court that any conspiracy between Butts and Wilson ended upon Wilson's statements to authorities (*Crowder v. State*, 237 Ga. 141, 153 (227 SE2d 230) (1976)), we further add that the statutory exception to the hearsay rule upon which Wilson relies makes declarations of conspirators admissible only *against* other conspirators. See *Dunbar v. State*, 205 Ga. App. 867, 869 (424 SE2d 43) (1992). It is the long-standing rule in this state that declarations to third persons to the effect that the declarant and not the accused was the actual perpetrator are, as a rule, inadmissible. *Timberlake v. State*, 246 Ga. 488 (1) (271 SE2d 792) (1980); *Lyon v. State*, 22 Ga. 399 (1857).

Furthermore, although this type of hearsay evidence is generally inadmissible (see *Timberlake v. State*, supra at (1)), under the principles set forth by this Court in *Drane v. State*, 265 Ga. 255 (455 SE2d 27) (1995), and by the U. S. Supreme Court in *Chambers v. Mississippi*, 410 U. S. 284, 302 (93 SC 1038, 35 LE2d 297) (1973) (failure to admit evidence of another's confession offered during guilt/innocence phase of trial constituted a violation of due process right), and *Green*

*v. Georgia,* 442 U. S. 95 (99 SC 2150, 60 LE2d 738) (1979) (failure to admit evidence of co-indictee's confession offered at punishment phase of trial violated due process right because testimony was highly relevant to a critical issue in punishment phase and substantial reasons existed to assume its reliability), there may be exceptional circumstances that make the hearsay evidence sufficiently reliable and necessary to require its admission. However, as stated in *Turner v. State,* 267 Ga. 149, 155 (476 SE2d 252) (1996), whenever defense counsel seeks to admit this type of hearsay evidence to support a claim that someone other than the defendant is responsible for the crimes being tried, counsel:

> must make a proffer in which the reliability and necessity of the hearsay evidence are thoroughly set out, and the trial court's ruling must reflect consideration of the proffered evidence and a determination that the evidence does or does not show "persuasive assurances of trustworthiness," or was made under circumstances providing considerable assurance of its reliability.

Despite being tried approximately one year after the *Turner* ruling was issued, Wilson, the hearsay proponent at trial, did not utilize the procedures set forth in *Turner* and did not obtain a ruling from the trial court evidencing its consideration of the proffered hearsay evidence under *Turner.* Accordingly, the trial court did not err in failing to address whether, under the standards set forth in *Green, Chambers,* and *Drane,* the hearsay evidence in question was sufficiently reliable, relevant, and necessary to require its admission in the guilt/innocence phase of Wilson's trial.

5. Wilson contends that the trial court erred in not striking certain jurors for cause. We find no reversible error in the trial court's rulings.

(a) Juror James Peugh, a former defense attorney, stated during his individual voir dire that he believed "99.9 percent of [criminal defendants] were guilty. . . ." The trial court denied a defense motion that the juror be stricken for cause, finding the juror had "rehabilitated himself" by stating in three separate responses that he thought he could be fair. Whether to strike a juror for cause lies within the sound discretion of the trial court (*Holmes v. State,* 269 Ga. 124 (2) (498 SE2d 732) (1998); *Garland v. State,* 263 Ga. 495 (1) (435 SE2d 431) (1993)), and a trial court is not obligated to strike a juror for cause in every instance where the potential juror expresses doubts about his or her impartiality or reservations about his or her ability to set aside personal experiences. Id.; *Waldrip v. State,* 267 Ga. 739 (8) (c) (482 SE2d 299) (1997); *Johnson v. State,* 262 Ga. 652

(2) (424 SE2d 271) (1993). The trial judge is uniquely positioned to observe a potential juror's demeanor and thereby to evaluate his or her capacity to render an impartial verdict. See *Greene v. State,* 268 Ga. 47 (485 SE2d 741) (1997); *Arnold v. State,* 236 Ga. 534 (6) (224 SE2d 386) (1976). The record reveals no evidence Juror Peugh had formed an opinion so fixed and definite that it would not be changed by the evidence or the charge of the court. See *Bright v. State,* 265 Ga. 265 (455 SE2d 37) (1995); *Childs v. State,* 257 Ga. 243 (357 SE2d 48) (1987); *Waters v. State,* 248 Ga. 355 (2) (283 SE2d 238) (1981). Accordingly, we find that the trial court's denial of Wilson's motion to strike Juror Peugh for cause was not a manifest abuse of its discretion. See *Diaz v. State,* 262 Ga. 750 (2) (425 SE2d 869) (1993).

(b) Juror John Mayzes had casually conversed with the victim about the Bible three times in Juror Mayzes's front yard but was otherwise completely unacquainted with the victim. Wilson did not move to strike Juror Mayzes for cause, and we find the trial court did not err by not striking him sua sponte. See *Mize v. State,* supra at (6) (c); *Spencer v. State,* 260 Ga. 640 (1) (398 SE2d 179) (1990); *Childs v. State,* supra. See also *Blankenship v. State,* 258 Ga. 43 (2) (365 SE2d 265) (1988) (applying Rule 10.1 of the Georgia Uniform Rules for the Superior Courts, 253 Ga. 823-824, when party failed to object to trial court's excusing certain jurors).

(c) Juror Henry Craig stated in his individual voir dire that his son and daughter had repeated to him statements of persons associated with the Sheriff's Department that indicated the Sheriff was confident regarding the identity of the killer. However, the juror clearly stated that he had not formed an opinion about the guilt or innocence of the defendant, and both defense counsel and the trial court questioned the juror as to his ability to disregard the hearsay statements and to consider only the evidence presented at trial. Accordingly, we find no error in the trial court's denial of the defendant's motion to strike the juror for cause. *Bright v. State,* supra at (8); *Waters v. State,* supra; *Tennon v. State,* 235 Ga. 594 (2) (220 SE2d 914) (1975); *Irvin v. Dowd,* 366 U. S. 717, 723 (81 SC 1639, 6 LE2d 751) (1961).

(d) Wilson complains that, because the victim had worked as a corrections officer, the trial court erred in denying his motion to strike for cause all jurors who either worked for or who had relatives who worked for the Department of Corrections. Blanket disqualification of jurors based solely upon their membership in a group to which the victim belonged is not required. *Jordan v. State,* 247 Ga. 328 (6) (276 SE2d 224) (1981); *Burgess v. State,* 264 Ga. 777 (8) (450 SE2d 680) (1994). The record reveals that the trial court adequately considered the potential bias of individual jurors connected to the Department of Corrections, and, accordingly, we conclude that the

trial court did not err in denying Wilson's blanket motion.

6. Wilson contends the trial court erred by not being present while the jury viewed the crime scene. Prior to the jury view, the defendant, the State, and the trial court agreed upon the procedure to be employed. The jury was to ride on a bus that would pause momentarily at the scene. The defense objected to having the trial judge travel on the bus with the jury, and the trial court acceded to the objection. The issue of whether the trial judge would follow in a separate vehicle was not discussed. The trial court dismissed the jury from the courtroom to board the bus with instructions that no one was to point at anything or to discuss anything at the scene and with instructions that they were to recognize their arrival at the crime scene based on their memory of the street names discussed at trial and by the momentary pause of the bus. The defendant and his counsel attended the jury view by following the bus in separate vehicles. No jury members left the bus at the scene.

Following the jury view, the defendant raised no objection to the jury view, including the apparent absence of the trial judge, and the defendant did not move for a mistrial. In his appeal, the defendant has not set forth any purported irregularity in the jury view, other than the trial judge's absence, despite the fact that he and his counsel were present at the jury view and enjoyed a vantage point that, given his objection to having the trial judge ride on the bus, was equivalent to that which the trial judge would have had if he had followed in a separate vehicle.

We find that the trial judge should have attended the jury view, even though his role at the jury view would have been minimal given the defendant's objection to the trial judge's presence on the bus. The absence of the trial judge from trial proceedings is reversible error when it is objected to and when it results in some harm. *Horne v. Rogers*, 110 Ga. 362 (5), (6) (35 SE 715) (1900); *Pritchett v. State*, 92 Ga. 65 (2) (18 SE 536) (1893); *O'Shields v. State of Ga.*, 81 Ga. 301 (6 SE 426) (1888); see also *Malcom Bros. v. Pollock*, 181 Ga. 687 (183 SE. 917) (1935). However, in this case, no objection was made to the trial judge's brief absence,[3] and the defendant and his counsel, who were both present at the jury view, are unable to demonstrate any harm. Accordingly, the trial judge's absence during the jury view is not reversible error.

7. The defendant contends that the charge given to the jury regarding a defendant's mere presence during the commission of a crime was potentially misleading, despite the fact that it was read

---

[3] The actual viewing of the crime scene by the jury was completed during the momentary pause by the bus. The mere transportation of the jury, of course, did not require the superintendence of the trial judge.

accurately from the suggested pattern charge, Suggested Pattern Jury Instructions, Vol. II: Criminal Charges, Part 3 (C), p. 18 (1995). The charge was a correct statement of the law and, particularly when read together with the other charges, would not have misled the jury.

8. Wilson contends that the trial court erred by failing to provide for opening statements at the beginning of the sentencing phase and by giving inadequate guidance to the jury in the sentencing phase. We disagree. Allowing opening statements at the beginning of the sentencing phase is the better practice, but it is not required. *Smith v. State*, 270 Ga. 240 (15) (510 SE2d 1) (1998). Furthermore, the trial court's instructions at the beginning of the sentencing phase, particularly when viewed together with the instructions given to the jury before it began deliberating on Wilson's sentence, provided ample guidance to the jury in fixing Wilson's sentence in the manner prescribed by law.

9. Wilson contends that the trial court's failure to charge the jury a second time on the credibility of witnesses during the penalty phase was reversible error. A second charge might be the better practice, but we find that the trial court had fully charged the jury with regard to the credibility of witnesses and expert witnesses during the guilt/innocence phase of the trial. The trial court's charge would have been understood by the jury to apply to all witnesses in both phases of the trial. This is comparable to a trial court's not again defining reasonable doubt in the sentencing phase after doing so in the guilt/innocence phase, which we have held not to be grounds for reversal. *Cromartie v. State*, 270 Ga. 780 (22) (514 SE2d 205) (1999); *Bennett v. State*, 262 Ga. 149 (10) (f) (414 SE2d 218) (1992). Accordingly, we find that the trial court's failure to charge the jury a second time on the credibility of witnesses was not reversible error.

10. The trial court was not required to charge the jury on a burden of proof applicable to non-statutory aggravating circumstances. *Cromartie*, supra; *Speed v. State*, 270 Ga. 688 (46) (512 SE2d 896) (1999); *Whatley v. State*, 270 Ga. 296 (11) (509 SE2d 45) (1998); *McClain v. State*, 267 Ga. 378 (8) (477 SE2d 814) (1996); *Ross v. State*, 254 Ga. 22 (5) (d) (326 SE2d 194) (1985); *Ward v. State*, 262 Ga. 293 (29) (417 SE2d 130) (1992).

11. The trial court did not err in failing to instruct the jury that its findings as to mitigating circumstances need not be unanimous because the trial court clearly charged the jury that it was not necessary to find *any* mitigating circumstances in order to impose a life sentence instead of the death penalty. *Palmer v. State*, 271 Ga. 234 (6) (517 SE2d 502) (1999); *McClain v. State*, supra at (6); *Wellons v. State*, 266 Ga. 77 (23) (463 SE2d 868) (1995); *Ledford v. State*, 264 Ga. 60 (20) (439 SE2d 917) (1994).

12. Wilson contends that the trial court erred by not charging the

jury that a finding of an aggravating circumstance must be unanimous. However, reversal on this ground is not required when, as in this case, the trial court charged the jury that its verdict as to the penalty must be unanimous. *Sears v. State*, 270 Ga. 834 (7) (e) (ii) (514 SE2d 426) (1999); *Davis v. State*, 263 Ga. 5 (15) (426 SE2d 844) (1993).

13. Wilson contends that the trial court erred by denying his motion for a mistrial when, during the penalty phase, the jury heard inadmissible hearsay testimony suggesting Wilson had shot the victim. The hearsay testimony was heard by the jury when a witness for the State was asked when he first heard about Wilson's murder charge and answered, "[An investigator] called me up one day and told me that the boy that had shot me got out of prison and shot somebody else." The granting of a motion for a mistrial is within the discretion of the trial court, and the trial court's ruling will not be disturbed when the trial court has taken remedial measures sufficient to ensure a fair trial. *Jones v. State*, 267 Ga. 592 (1) (b) (481 SE2d 821) (1997); *Cowards v. State*, 266 Ga. 191 (3) (c) (465 SE2d 677) (1996). The record reveals that the trial court gave sufficient curative instructions and did not abuse its discretion in denying the defendant's motion for a mistrial.

14. Wilson contends that his right to a fair trial was abridged by the introduction of a photograph of the victim in life and by the manner in which that photograph was introduced. It is not error to admit a photograph of the victim in life; however, the better practice is to have the photograph identified by someone other than a close relative of the victim. *James v. State*, 270 Ga. 675 (5) (513 SE2d 207) (1999); *Whatley v. State*, supra at (8); *Ledford v. State*, supra at (14). In this case, the prosecutor asked the victim's father, the first witness at trial, whether he had given the State a picture of his son. The prosecutor then had the victim's father testify as to the date of and other details about the photograph. The photograph was never shown to the victim's father while he was on the stand, and there is no evidence in the transcript of any emotional display on his part. The photograph was later viewed and identified by a non-relative and was then introduced into evidence. We find that the defendant was not denied a fair trial under these circumstances.

15. Wilson contends that the trial court erred in admitting certain photographs which depicted the victim as he was found at the crime scene and as he appeared shortly before autopsy. We find that these photographs were material, relevant, and admissible. *Jackson v. State*, 270 Ga. 494 (8) (512 SE2d 241) (1999); *Jenkins v. State*, 269 Ga. 282 (20) (498 SE2d 502) (1998); *Crozier v. State*, 263 Ga. 866 (2) (440 SE2d 635) (1994).

16. (a) We find that the prosecution's characterization of the vic-

tim as a helpless, nice, unarmed person was relevant to the jury's determination of guilt as to the malice murder charge and did not unfairly prejudice the defendant, constitute improper victim impact testimony, or deny the defendant a fair trial.

(b) Contrary to the defendant's contention, we conclude that the prosecution did not invite the jury to place itself in the place of the victim.

(c) During his closing argument at the end of the guilt/innocence phase of the trial, the prosecutor interspersed his argument with direct quotations from the Georgia Code, arguing how the statutory elements set forth in the quotations had been proved. The practice of "reading the law" in a criminal proceeding was condemned by this Court some time ago as offering a license for counsel to present portions of the law to the jury that would not constitute part of the trial court's charge. *Conklin v. State*, 254 Ga. 558 (10) (331 SE2d 532) (1985). However, "[c]ounsel have every right to refer to applicable law during closing argument" when that law will be charged by the trial court. Id.; *Felder v. State*, 270 Ga. 641 (3) (514 SE2d 416) (1999). Indeed, we have held that restraining counsel from discussing and arguing law that will be charged to the jury is error. *Minter v. State*, 266 Ga. 73 (463 SE2d 119) (1995). Accordingly, we conclude that under the circumstances of this case, the trial court did not err in failing to restrain the State from discussing the law in the manner complained of.

(d) Wilson contends the State, in its closing argument in the guilt/innocence phase, made statements that improperly emphasized the defendant's exercise of his right not to testify and the failure of Butts, the other participant in the murder, to give a statement after being arrested.[4] We find no evidence in the record that the defendant objected to the purportedly inappropriate statements or moved for a mistrial, and, generally, such an objection cannot be raised for the first time in a motion for a new trial or on appeal. *Landers v. State*, 270 Ga. 189 (2) (508 SE2d 637) (1998); *Roberts v. State*, 231 Ga. 395 (1) (202 SE2d 43) (1973). When no objection has been made at trial, such allegedly improper statements warrant reversal only if they in reasonable probability changed the result of the trial. *Ledford v. State*, supra at (18) (a); *Todd v. State*, 261 Ga. 766 (2) (410 SE2d 725) (1991). Without addressing whether the statements were improper, we find that they did not in reasonable probability change the result of the trial and, therefore, cannot serve as grounds for reversal because they were not objected to.

---

[4] Given the defendant's failure to object at trial, we need not address the question of his standing to object to the alleged comment on the post-arrest silence of the co-participant.

17. Wilson contends that certain portions of the State's opening statement during the guilt/innocence phase of his trial were inflammatory and improperly called into question the impact of the victim's death upon the victim's family. The proper test on review when, as here, the defendant has not objected to allegedly improper statements is whether the statements in reasonable probability changed the result of the trial. Id. We find no such reasonable probability with respect to the statements complained of, and, therefore we need not address whether the statements were improper.

18. Wilson contends that two statements he made to law enforcement officers (one tape-recorded, one written) along with statements he made to police regarding his and Butts's actions after the murder were improperly admitted into evidence. We disagree.

Wilson contends that the statements should have been excluded from evidence because they were allegedly induced by a hope of benefit in violation of OCGA § 24-3-50. Wilson's contention at the suppression hearing hinged upon an evaluation of the credibility of witnesses. It is the province of the trial court to weigh the credibility of witnesses in such a hearing, and, unless clearly erroneous, its findings of fact will not be disturbed on appeal. *Gilliam v. State*, 268 Ga. 690 (3) (492 SE2d 185) (1997); *Arline v. State*, 264 Ga. 843 (2) (452 SE2d 115) (1995); *Caffo v. State*, 247 Ga. 751 (279 SE2d 678) (1981). We find no error in the trial court's ruling as to the absence of an inducement by a hope of benefit.

Wilson also contends that he was not made aware of his rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), prior to making the contested statements and that, prior to making the tape-recorded statement, he had been denied a request for an attorney. This contention also hinged upon the credibility of witness testimony, and we do not find the trial court's assessment of witness credibility in this matter to have been clearly erroneous. *Gilliam v. State*, supra. Accordingly, we conclude that the trial court did not err in its ruling as to Wilson's *Miranda* rights.

19. The trial court did not err in denying Wilson's motion for a change of venue. Wilson contends that a change of venue was necessary because of pretrial publicity and the fact that, like the victim, a large number of Baldwin County residents were Department of Corrections employees.

In order to justify a change of venue based upon pretrial publicity, a capital defendant must show that the trial setting was inherently prejudicial as a result of pretrial publicity or show actual bias on the part of the individual jurors. *Jenkins v. State*, supra at (3); *Jones v. State*, 267 Ga. at (1) (a). A change of venue is appropriate in a death penalty case when the "defendant can make a substantive showing of the likelihood of prejudice by reason of extensive public-

ity." *Jones v. State*, 261 Ga. 665 (2) (409 SE2d 642) (1991). The decisive factor in determining whether a change of venue is required is "the effect of the publicity on the ability of prospective jurors to be objective." *Freeman v. State*, 268 Ga. 185 (2) (486 SE2d 348) (1997). The extent and timing of pretrial publicity are also factors to be considered. Id.; *Thornton v. State*, 264 Ga. 563 (17) (449 SE2d 98) (1994). Our review of the record does not indicate that the pretrial publicity created a likelihood of prejudice. Of the large number of jurors subjected to individual voir dire, none was stricken for cause because of his or her exposure to pretrial publicity.

As to Wilson's contention that the large number of Department of Corrections employees in Baldwin County warranted a change of venue, we note, as in our discussion above regarding the defendant's motion to strike all such persons for cause, that persons are not deemed unqualified to serve as jurors based solely upon their membership in a group to which the victim belonged. *Jordan v. State*, supra. It must be demonstrated that the persons or class of persons will be unable to serve as fair and impartial finders of fact, a showing not made by Wilson in his motions to strike for cause or his motion for a change of venue.

20. Wilson contends that the trial court erred by allowing evidence during the penalty phase of a number of crimes committed by him as a juvenile, including shooting two persons and a dog, first degree arson, criminal trespass, felony obstruction of a law enforcement officer, assault of an officer in a youth detention facility, possession of cocaine, and making a death threat. We disagree. Such records are admissible in the penalty phase of a capital murder case. *Smith v. State*, supra at (2); *Burrell v. State*, 258 Ga. 841 (7) (376 SE2d 184) (1989); OCGA § 15-11-38 (b).

Wilson further contends that evidence of his prior criminal activity was improperly admitted during the penalty phase because the evidence was insufficiently reliable. Again, we disagree. "The factors normally considered in sentencing are (1) the character of the defendant, including his previous criminal activity, if any, and (2) the circumstances of the crime on trial." *Ford v. State*, 257 Ga. 461 (1) (360 SE2d 258) (1987); *Kinsman v. State*, 259 Ga. 89 (15) (376 SE2d 845) (1989). Evidence of bad character and previous crimes must be reliable (*Williams v. State*, 258 Ga. 281 (7) (368 SE2d 742) (1988)) but, when considering non-statutory aggravating circumstances, the jury is not required to evaluate each and every evidentiary vignette pursuant to the reasonable doubt standard. *Ward v. State*, supra; *Ross v. State*, supra. The trial court is certainly not required to apply such a standard in determining if the evidence is admissible. The fact that the defendant was able to set forth evidence weighing against a finding of guilt as to the previous crimes does not in and of itself

make the State's evidence unreliable. We find that the trial court did not err in admitting the contested evidence.

Finally, we find no merit in Wilson's contention that the trial court improperly admitted testimony that Wilson had threatened to kill a man and his mother. Wilson argues that the testimony was inadmissible because it lacked the corroboration required for conviction of the crime of making a terroristic threat. See OCGA § 16-11-37 (a). However, we find that the testimony was admissible as evidence of bad character. For the same reasons that evidence of acts reflecting bad character need not be evaluated according to the reasonable doubt standard (*Ward v. State*, supra; *Ross v. State*, supra), such evidence also need not be sufficient to allow conviction under the evidentiary requirements of a specific criminal statute. The evidence need only be reliable. *Williams v. State*, supra.

21. Wilson contends that he was denied a fair trial because the judge who presided over many of the pretrial proceedings was replaced for health reasons before the trial began by another judge who presided over the remainder of the case, including two remaining pretrial motion hearings, jury selection, both phases of the trial, and the defendant's motion for a new trial. Prior to the first judge's departure, Wilson requested that only one judge preside over both jury selection and the trial, and this request was accommodated. Wilson made no other objection to the substitution, and, therefore, this argument is waived. *Earnest v. State*, supra.

22. Wilson contends that it was error for the trial court to deny his trial counsel's request to be discharged from representing Wilson based on the fact that counsel's wife worked for the Department of Corrections, knew persons who were acquainted with the victim, and was herself casually acquainted with the victim. Our evaluation of the alleged conflict requires us to "examine the particular circumstances of the representation[ ] to determine whether counsel's undivided loyalties remain[ed] with his . . . client, as they must." *Hill v. State*, 269 Ga. 23 (2) (494 SE2d 661) (1998) (evaluating alleged conflict of interest arising from defense counsel's previous representation of State's witness). See also *Hudson v. State*, 234 Ga. App. 895 (3) (a) (508 SE2d 682) (1998). The relationship between defense counsel and the victim was both minimal and indirect. Furthermore, the record reveals no evidence that defense counsel was affected by his minimal relationship to the victim. Accordingly, we find that the trial court did not err in ruling that there was no disqualifying conflict of interest.

23. We find that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. OCGA § 17-10-35 (c) (1). We also find, considering both the crime and the defendant, that the sentence of death was neither

excessive nor disproportionate to the penalties imposed in similar cases. OCGA § 17-10-35 (c) (3). The similar cases listed in the Appendix support the imposition of the death penalty in this case, as all are cases of intentional killing committed during the commission of an armed robbery or a motor vehicle hijacking.

*Judgment affirmed. All the Justices concur, except Carley, J., who concurs in judgment only as to Division 6, and Sears, J., who concurs in part and dissents in part.*

SEARS, Justice, concurring in part and dissenting in part.

I concur in the majority's affirmance of appellant's adjudication of guilt. However, regarding appellant's death sentence, the majority implicitly concludes that no Eighth Amendment concerns are raised by the sentence of death by electrocution.[5] This conclusion, however, is reached without the benefit of forthcoming guidance from the United States Supreme Court on that issue, and without an analysis of the voluminous evidence that is available regarding the constitutional implications of electrocution. For the first time in its history, the United States Supreme Court is poised to make a determination of whether there is evidence to show that a particular method of execution — electrocution — violates the Eighth Amendment's prohibition against cruel and unusual punishment. Because I believe prudence requires this Court to stay its Eighth Amendment rulings in capital cases until we receive guidance from the United States Supreme Court in the coming months, I respectfully dissent to the affirmance of appellant's death sentence.

At the outset, I emphasize that my constitutional concerns are not with the State's power to impose the death penalty for statutorily-enumerated crimes.[6] Rather, my concern focuses upon the only available method of carrying out a death sentence in Georgia — electrocution in Georgia's electric chair. Despite having issued opinions in many matters in which death sentences have been imposed, the United States Supreme Court has never decided whether there is evidence to show that any particular method of execution (including electrocution) violates the Eighth Amendment's Cruel and Unusual Punishment Clause.[7] However, that will soon change, as the

---

[5] In all capital cases, this Court is obligated to undertake a sua sponte review of the death sentence to determine, among other things, whether the penalty is excessive. OCGA § 17-10-35. "This penalty question is one of cruel and unusual punishment, and is for the court to decide" in all cases. *Blake v. State*, 239 Ga. 292, 297 (236 SE2d 637) (1977).

[6] See, e.g., *Pruitt v. State*, 270 Ga. 745 (514 SE2d 639) (1999) (Sears, J., writing for the majority's affirmance of death sentence); *Whatley v. State*, 270 Ga. 296 (509 SE2d 45) (1999) (same); *Thomason v. State*, 268 Ga. 298 (486 SE2d 861) (1997) (same).

[7] Denno, *Getting to Death: Are Executions Constitutional?*, 82 Iowa Law Rev. 319 (1997). See *Poyner v. Murray*, 508 U. S. 931, 933 (113 SC 2397, 124 LE2d 299) (1999) (Souter, J.,

Supreme Court has recently granted certiorari in a capital habeas corpus action to review whether execution by electrocution violates the Federal Constitution's prohibition against cruel and unusual punishment.[8]

Nor has Georgia's Supreme Court ever undertaken its own analysis of whether there is objective evidence to show that death in the State's electric chair constitutes cruel and unusual punishment, as that phrase is constitutionally understood.[9] Rather, this Court has habitually disposed of such claims perfunctorily, without considering whether a growing body of evidence indicates that electrocution causes a lingering death and undue violence, torture, and mutilation.[10] I believe that it is time for this Court to cease its cursory review of Eighth Amendment claims in capital cases, and to confront head-on the issue of whether there is evidence to show that execution by electrocution is unconstitutionally cruel and unusual. To my mind, the logical and prudent first step in that process is to await pending word from the nation's highest court regarding that very issue.[11]

The constitutional ramifications of electrocution are overly ripe for review. An Eighth Amendment analysis of evidence pertaining to any method of execution would adhere to four lines of inquiry: (1) Does the method of execution involve "something more than the mere extinguishment of life,"[12] such as "torture or a lingering death . . .

---

joined by Blackmun and Stephens, dissenting from denial of certiorari).

Contrary to popular misconception, the Supreme Court's ruling in *In re Kemmler*, 136 U. S. 436 (10 SC 930, 34 LE 519) (1890) (the last case in which the High Court has considered a method of execution), does not hold that electrocution is per se constitutional if there is no undue pain suffered by the condemned. See *Poyner*, supra. Rather, the *Kemmler* decision merely deferred to the New York state court's finding that, in light of the available options at that time, electrocution was permissible as a more humane alternative to death by hanging. *Kemmler*, 136 U. S. at 444 (noting that the then-governor of New York had called execution by hanging "barbaric"). Indeed, *Kemmler* cannot be read as rejecting evidence that purportedly shows electrocution is constitutionally cruel and unusual, because, at the time it was decided, no one had yet been electrocuted. Moreover, at the time *Kemmler* was decided, it was not yet established that the Eighth Amendment applies to the States through the Fourteenth Amendment. Cf. *Robinson v. California*, 370 U. S. 660, 667-668 (82 SC 1417, 8 LE2d 758) (1962). Shortly after *Kemmler* was issued, William Kemmler became the first man executed in the electric chair in what was widely publicized as a grotesque and morbid technical bungle. See Denno, supra, p. 362, n. 261.

[8] *Bryan v. Moore*, Case No. 99-6723 (Oct. 26, 1999). See 68 USLW 3281 (11/2/99).

[9] See *DeYoung v. State*, 268 Ga. 780 (493 SE2d 157) (1997) (Fletcher, P. J., concurring); see also *Stanford v. Kentucky*, 492 U. S. 361, 369 (109 SC 2969, 106 LE2d 306) (1989) (Eighth Amendment determination should be based as much as possible upon objective criteria).

[10] See, e.g., *DeYoung*, supra; *Wellons v. State*, 266 Ga. 77 (463 SE2d 868) (1995).

[11] I note that Florida, one of only two other states to currently practice electrocution, has stayed all of its executions of condemned prisoners until the U. S. Supreme Court issues its ruling on the constitutionality of electrocution. See "Special Session Could Introduce Lethal Injection," Orlando Sentinel, 12/6/99.

[12] *Kemmler*, 136 U. S. at 447. As stated by Justice Burton more than half a century ago:

something inhuman and barbarous"?;[13] (2) Is the infliction of unnecessary pain, undue physical violence, or bodily mutilation and distortion inherent in the method of execution?;[14] (3) Does the method of execution offend "the evolving standards of decency that mark the progress of a maturing society,"[15] and has it been approved, rejected or abandoned in other states and in other civilized nations?;[16] and (4) Are more humane methods of execution available?[17]

Regarding the first two of these inquiries: Increasingly, there are reports that electrocution involves (a) lingering death that can last for more than a quarter hour; (b) bodily mutilation and distortion, including third and fourth degree burns to the face and scalp, exploding body parts, and layers of skin melting away so as to reveal bone; and (c) grotesque physical violence indicative of both inhumanity and barbarity.[18] In other words, there is mounting evidence to indicate

---

> The taking of human life by unnecessarily cruel means shocks the most fundamental instincts of civilized man. It should not be possible under the constitutional procedure of a self-governing people. . . . The all-important consideration is that the execution shall be so instantaneous and substantially painless that the punishment shall be reduced, as nearly as possible, to no more than that of death itself.

*Louisiana ex rel. Francis v. Resweber*, 329 U. S. 459, 473-474 (67 SC 374, 91 LE 422) (1947) (Burton, J., dissenting). See *Kemmler*, supra, 136 U. S. at 443-444, 447; *Glass v. Louisiana*, 471 U. S. 1080, 1085 (105 SC 2159, 85 LE2d 514) (1985) (Brennan, J., joined by Marshall, J., dissenting from denial of certiorari).

[13] *Kemmler*, 136 U. S. at 447.

[14] *Resweber*, supra.

[15] *Trop v. Dulles*, 356 U. S. 86, 100-101 (78 SC 590, 2 LE2d 630) (1958).

[16] See id.; *Coker v. Georgia*, 433 U. S. 584, 593-594 (97 SC 2861, 53 LE2d 982) (1977).

[17] See *Gregg v. Georgia*, 428 U. S. 153, 170 and n. 17 (96 SC 2909, 49 LE2d 859) (1976). As stated by Justice Powell:

> Neither the Congress nor any state legislature would today tolerate pillorying, branding, or cropping and nailing the ears — punishments that were in existence during our colonial era. Should however, any such punishment be prescribed, the courts would certainly enjoin its execution. Likewise, no court would approve any implementation of the death sentence found to involve unnecessary cruelty in light of presently available alternatives.

*Furman v. Georgia*, 408 U. S. 238, 430 (92 SC 2726, 33 LE2d 346) (1972) (Powell, J., dissenting). These views of Justice Powell's were largely adopted in *Gregg*, supra.

[18] For example, in March 1997, Pedro Medina was executed in Florida's electric chair. When the electricity was applied, Medina "lurched backward and balled his hands into fists," while his face mask "burst into flames." Blue and orange flames up to twelve inches long shot from the right side of Medina's head and flickered for up to ten seconds. A solid flame then covered Medina's entire head, from one side to the other. After the current was turned off, a maintenance worker wearing electrical gloves patted out the flames on Medina's body and another worker opened a window to disperse the thick smoke that hung in the air. Witnesses described the smell as nauseating. An autopsy of Medina's corpse revealed a "burn ring" around the crown of his head, within which was a third degree burn containing deposits of charred material. Medina's face was covered with first degree burns, caused by scalding steam. See Denno, supra, App. 2 (A) (18); *Provenzano v. Moore*, 1999 WL 756012 at * 19 (Fla. 1999) (Shaw, J., dissenting).

When Allen Lee Davis was executed in Florida's electric chair in July 1999, a leather strap was secured across his mouth and part of his nostrils, and a heavy fabric face mask was placed over his head. Blood poured from his nose before and during the electrocution,

that electrocution involves more than "the mere extinguishment of life,"[19] the benchmark for constitutional executions, and such evidence should be addressed as part of this Court's responsibility to review all capital sentences in Georgia.

Concerning the third prong of the analysis discussed above, I am increasingly concerned that electrocution and its effects on the human body may offend society's evolving sense of decency. The Eighth Amendment's fundamental purpose is "to protect the dignity of society itself from the barbarity of exacting mindless vengeance."[20] The Amendment's scope is not static; rather, it is hewn from the evolving standards of decency that characterize a mature, civilized society,[21] and it acquires meaning "as public opinion becomes enlightened by a humane justice."[22] Thus, whether a particular form of punishment is cruel and unusual under the Eighth Amendment must be determined by considering contemporary moral standards as determined by objective evidence regarding a national consensus.[23]

Electrocution is practiced in no other country in the civilized world. Within this country, 27 states practiced it in 1949. Since then, 20 states have dropped it altogether, and four states — Arkansas, Ohio, South Carolina and Virginia — continue to offer it as an alternative; although Ohio has not executed anyone since 1976.[24] At present, only three states — Georgia, Florida, and Alabama — actively

---

and several witnesses reported hearing two screams from Davis when the current was applied. By the time the execution was completed, a blood pool "the size of a dinner plate" covered the front of Davis's shirt. It was later determined that Davis's death was caused in part by asphyxiation caused by the leather face strap. As with Medina, Davis's head, face, and scalp were severely burned, as were his knees and thighs. *Provenzano*, supra at * 20-22.

Witnesses observing Larry Lonchar's November 1996 execution in Georgia's electric chair report that two 2000 volt jolts of electricity were required before he was pronounced dead, and that the process required twelve minutes to complete. During that time, Lonchar moaned, clenched his fists (which had turned dark red), lurched and gasped for air. Denno, supra, App. 2 (A) (17). Other electrocutions have routinely resulted in third and fourth degree burns with skin sloughing, "meaning the skin had literally come loose from [the] body and was sliding." Id., App. 2 (A) (8). Electrocution sometimes burns chunks of skin off a condemned person's head or leg, revealing the skull or bone beneath the tissue. Id. Electrocution also has caused a man's penis to explode, blood to pour from eye sockets, bodily fluids to boil, and ears to burn away. Id., 82 Iowa L. Rev. at 359, and App. 2 (A) (12).

For an in-depth account of electrocution's effects, see Denno, supra, App. 2 (A), "Post-*Gregg* Botched Executions." See also Denno, *Is Electrocution an Unconstitutional Method of Execution? The Engineering of Death Over the Century*, 35 Wm. & Mary L. Rev. 551 (1994).

[19] *Kemmler*, 136 U. S. at 447.

[20] *Ford v. Wainwright*, 477 U. S. 399, 410 (106 SC 2595, 91 LE2d 335) (1986).

[21] *Trop*, supra.

[22] *Weems v. United States*, 217 U. S. 349, 378 (30 SC 544, 54 LE 793) (1910).

[23] *Penry v. Lynaugh*, 492 U. S. 302, 331 (109 SC 2934, 106 LE2d 256) (1989); *Stanford*, supra.

[24] See *Provenzano*, 1999 WL 756012 at * 23-24.

use electrocution as the sole method of executing condemned prisoners.[25]

The death penalty is just punishment for those whose crimes deserve the ultimate penance, and it also serves a societal need to see retribution for that class of crimes. I believe, however, that it is time to examine whether Georgia's current method of enforcing the death penalty and its attending consequences are compatible with the dignity, morality, and decency of society's enlightened consciousness, and is reflective of a humane system of justice. I note that both the American Veterinarian Medical Association and the Humane Society of the United States prohibit electrocution as a means of euthanatizing animals.[26]

Finally, concerning the last prong of the inquiry discussed above, it appears that less cruel and more humane means of execution may currently be practiced in other states and countries.

While this dissent's overview of the Eighth Amendment implications of electrocution barely scratches the surface of what will be required for an adequate in-depth analysis of the constitutional issue I urge the Court to take up, I nonetheless hope it emphasizes the great need for us not to prolong fulfillment of our constitutional responsibility to "protect the dignity of society itself from the barbarity of exacting mindless vengeance."[27] For all the reasons discussed above, I would stay ruling on appellant's Eighth Amendment claim until we receive guidance on that issue from the United States Supreme Court, and I would then proceed with our own assessment of the issue.

Appendix.

*Lee v. State*, 270 Ga. 798 (514 SE2d 1) (1999); *Whatley v. State*, 270 Ga. 296 (509 SE2d 45) (1998); *Bishop v. State*, 268 Ga. 286 (486 SE2d 887) (1997); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *McClain v. State*, 267 Ga. 378 (477 SE2d 814) (1996); *Green v. State*, 266 Ga. 439 (469 SE2d 129) (1996); *Crowe v. State*, 265 Ga. 582 (458 SE2d 799) (1995); *Mobley v. State*, 265 Ga. 292 (455 SE2d 61) (1995); *Christenson v. State*, 262 Ga. 638 (423 SE2d 252) (1992); *Meders v. State*, 261 Ga. 806 (411 SE2d 491) (1992); *Ferrell v. State*, 261 Ga. 115 (401 SE2d 741) (1991); *Stripling v. State*, 261 Ga. 1 (401 SE2d 500) (1991); *Car-*

---

[25] Nebraska legally authorizes electrocutions as its sole method of execution, but has apparently ceased carrying out capital sentences.

[26] See Humane Society of the U. S., General Statement Regarding Euthanasia Method for Dogs and Cats, 17 Shelter Sense, Sept. 1994 at 11-12; American Veterinarian Med. Assn., 202 JAVMA 230, 230-249 (1993).

[27] *Ford*, supra.

*gill v. State*, 255 Ga. 616 (340 SE2d 891) (1986); *Ingram v. State*, 253 Ga. 622 (323 SE2d 801) (1984).

DECIDED NOVEMBER 1, 1999 —
RECONSIDERATION DENIED DECEMBER 20, 1999.

*Waddell, Emerson & Buice, John H. Bradley, Jon P. Carr*, for appellant.

*Fredric D. Bright*, District Attorney, *Thurbert E. Baker*, Attorney General, *Susan V. Boleyn*, Senior Assistant Attorney General, *Beth A. Burton*, Assistant Attorney General, for appellee.