## S06A0459. HINTON v. THE STATE.
### (631 SE2d 365)

BENHAM, Justice.

Colvin C. Hinton III appeals his conviction for the murder of Shannon Melendi.[1] Viewed in a light favorable to the verdict (*Harvey v. State*, 274 Ga. 350 (2) (554 SE2d 148) (2001)), the evidence at trial showed the following. Melendi was an Emory University student who worked part-time at the Softball Country Club (SBCC) in DeKalb County where Hinton, employed by Delta Airlines as a maintenance utility employee, also worked part-time as an umpire. On March 26, 1994, Hinton umpired a game at which Melendi worked as score-keeper. Several players complained that Hinton neglected his duties in that game to look at and converse with Melendi. After several games, Hinton left SBCC around 12:45 p.m. and Melendi departed in the same direction five minutes later. She was never seen alive after that day and her body has never been found. Her car, of which she was very proud and took great care, was found later at a nearby gas station, parked crookedly and left unlocked with the keys in the ignition. An employee of the station reported seeing Melendi there on the day she disappeared.

Hinton had been scheduled to work a full day at SBCC on March 26, but after he learned the day before that his wife would be out of town that day, he made other arrangements. He first called his wife's best friend and arranged to meet her that Saturday afternoon, telling her it was important that she not tell anyone where she was going or who she was meeting, and assuring her his wife would be there, too. Hinton then called another umpire and asked him to cover the afternoon and evening games because he had a "hot date." When the other umpire was unable to accommodate him, Hinton called the

---

[1] The victim was last seen on March 26, 1994, and a DeKalb County grand jury returned an indictment in the July 2004 term of court charging Hinton with malice murder and felony murder (kidnapping). After a jury trial conducted August 10-September 19, 2005, resulted in a verdict of guilty on both counts, Hinton was sentenced to life imprisonment for malice murder, the felony murder count being vacated by operation of law. Pursuant to a notice of appeal timely filed on October 10, 2005, the appeal was docketed in this Court on November 10, 2005, and was submitted for decision following oral argument on March 13, 2006.

umpire supervisor and told her he needed the afternoon off to care for the children of his sister-in-law who had been hospitalized by a beating from her husband. As he left SBCC's clubhouse on March 26, he told another umpire he was going on a date with a woman who was "hot."

Hinton reappeared at SBCC between 2:30 and 3:00 that afternoon and was also seen around that time at the gas station where Melendi's car was found. He entered the clubhouse in an umpire's uniform and left a few minutes later in other clothes. He claimed then he was getting ready to play, but was seen shortly thereafter by the same witness headed for the clubhouse. Another witness saw Hinton around 5:00 p.m. and remarked he thought Hinton had left, to which Hinton replied he had forgotten to turn in a pay slip and had returned to do so. However, Hinton claimed to have just arrived, but had no pay slip in his hand, and asked the witness whether he knew where Hinton had parked his car. This witness testified that after Hinton became a suspect, they had a conversation in which the witness asked why Hinton had not told the FBI about returning to the SBCC and seeing the witness, to which Hinton responded by asking the witness to disregard the information because it did not match what he told the FBI. Hinton made several telephone calls that afternoon from his Clayton County home, the first less than 40 minutes after his departure from the SBCC, a 25-minute drive from his home. He was seen tending a bonfire in his yard around 3:00 a.m. the next morning, and borrowed a bow saw from his father later that morning, a saw subsequently seized from his home in a search. Searches of Hinton's home revealed three pits buried in the back yard, one of which contained wire ties that could be used to bind wrists and ankles. A black bag like one Hinton was seen carrying on the day Melendi disappeared was also found.

The police initially treated Melendi's disappearance as a possible runaway case and released her car to her roommate without processing it for evidence. Family and friends, however, believed she would not have left them without any word and testified extensively at trial to her strong relationships with friends and family. Posters were put up and media outlets were enlisted to seek information. Three days after her disappearance, a man calling the DeKalb Police Department phone number on the posters correctly identified the color of the shorts Melendi was wearing as blue instead of green as the media had reported, and said in a harsh and angry voice that he "got" the victim at the station and would keep her until he was through with her. In early April, a man called the Emory University Counseling Center to say he had Melendi, she was healthy, and he would call later with his demands. He claimed to have a ring of Melendi's and mentioned masking tape. Led by "Caller ID" to the payphone from which the call

was made, an FBI agent found the ring in a small cloth bag wrapped in masking tape. The bag was traced to the manufacturer who said Delta was its only customer in Georgia. That type bag was used in the facility where Hinton worked, as was the type of masking tape used. Particles of metal found on the tape wrapping the bag with the ring were also found on a fragment of tape in Hinton's car and were a combination of metal debris found only in environments involving jet engine maintenance and repair. A waitress at a restaurant near the payphone testified Hinton was a regular customer there.

After he became a suspect, Hinton attempted to get another Delta employee to get him a "pass card ticket" and sought to borrow a suit from another employee because pass card tickets could not be used unless the employee was wearing a suit. However, news media reported Hinton's status as a suspect that night and he never returned to work at Delta.

Evidence of two prior criminal occurrences was introduced as similar transactions. In one, Hinton went to his employer's home in Kentucky and assaulted and attempted to restrain with rope the employer's wife who persuaded him to let her go by promising not to call the police, which she did immediately after he released her and left. An FBI agent testified Hinton told him he had attempted to rape his employer's wife and that he was treated as a juvenile and given psychiatric treatment. In the second incident, while living in Illinois, Hinton lured his younger brother's former girlfriend to a meeting with a lie about his brother being in town, restrained her with rope, abducted her, sexually fondled her, and imprisoned her in his basement, from which she was released when Hinton's wife found her there. Hinton was charged with kidnapping and indecent liberties with a minor and served a prison term.

Convicted in federal court in 1996 of mail fraud and using a fire to commit a felony, both arising from the September 1994 burning of his house in Clayton County, Hinton was sentenced to a prison term of more than ten years. Several persons Hinton met while in federal prison testified to statements he made to them during his incarceration there. Adonis Cornwell testified that after he was awakened in the cell he shared with Hinton by a scream and found Hinton crying, Hinton told him that he had not killed her, the demon inside him had; that the girl worked at a softball park and her car was found nearby with the keys in it. Curtis O'Neal testified that after he mentioned he knew someone charged with murder even though no body was found, Hinton asked O'Neal to show him how to research in the law library cases in which no body was found, and later asked him to sign an affidavit that they had not discussed his case. Allen Howell testified Hinton was worried he would be indicted for Melendi's death because his score book had been left in her car and he had previous offenses,

and that he had been burning a lot of brush and wanted to know what would be left after a body was burned. Johnny Pleasants testified that when he told Hinton gambling was his weakness, Hinton said young girls were his. Hinton told Pleasants he was a suspect in the disappearance of a girl who worked at the same ballpark at which he had been an umpire; that she reminded him of a woman he had an affair with in Kentucky years earlier, and the authorities suspected him because they were aware of that situation; that he was not worried about them finding a body; and that he could be forgiven no matter what he had done. Anthony Olivaria testified he heard Hinton say while praying that if Moses could be forgiven for murder, he could, too. Ronson Westmoreland testified Hinton said he and Melendi left the softball park in her car, which was later left at a gas station; that the police were stupid to have released the car without searching it; that the victim was a tease; that her body had been scattered to the wind; that the best way to dispose of a body was to cut it up, crush the bones, and throw the pieces in a river; that he was a butcher; and that God will forgive murder.

1. In three enumerations of error, Hinton contends the evidence as a whole was insufficient and, specifically, the evidence was insufficient to establish venue in DeKalb County. With regard to venue, which must be proved beyond a reasonable doubt as an element of the offense (*Turner v. State*, 273 Ga. 340 (3) (541 SE2d 641) (2001)), the evidence summarized above, particularly the evidence that Hinton and Melendi left the SBCC within five minutes of each other after Hinton had spent an inappropriate amount of the softball game they worked talking to Melendi, that her car was found abandoned at a gas station adjacent to the SBCC, that a person whose voice characteristics matched Hinton said on the telephone he had taken Melendi at "the station," and that the SBCC and the gas station were in DeKalb County, was sufficient to show beyond a reasonable doubt that the murder might have been committed in DeKalb County. Accordingly, the proper trial venue under OCGA § 17-2-2 (h) was proved to be in DeKalb County. *Turner v. State*, supra.

With regard to the sufficiency of the evidence overall, the evidence adduced at trial and summarized above, though largely circumstantial, was sufficient to authorize a rational trier of fact to find Hinton guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). That being so, there was no error in denying Hinton's motion for a directed verdict of acquittal. *Lowe v. State*, 267 Ga. 180 (1) (476 SE2d 583) (1996).

2. Hinton contends that even if the evidence of venue was sufficient under OCGA § 17-2-2 (h), that statute is unconstitutional because it conflicts with the requirement that a criminal trial must be conducted in the county in which the crime was committed. That

contention is controlled adversely to Hinton by *Bundren v. State*, 247 Ga. 180, 181 (1) (274 SE2d 455) (1981), where this Court rejected the same argument: "[OCGA § 17-2-2 (h)] does not violate the mandate of [Art. VI, Sec. II, Par. VI, Ga. Const. 1983]. It merely provides a mechanism by which that mandate can be carried out when the place in which the crime is committed cannot be determined with certainty."

3. Hinton contends the trial court erred in denying his general and special demurrers to both counts of the indictment. Specifically, he claims the indictment was defective because it did not set out the essential element of malice in the malice murder count and did not allege an adequately connected felony in the felony murder count. We need only address the malice murder count of the indictment: "Since the trial court entered a judgment of conviction and sentence on the verdict finding appellant guilty of malice murder and not on the felony murder verdict, any issue concerning the felony murder count of the indictment is moot. [Cit.]" *Richardson v. State*, 276 Ga. 548, 551 (2) (b) (580 SE2d 224) (2003).

Count one of the indictment alleged Hinton "unlawfully and with malice aforethought, did kill, murder, and cause the death of Shannon Melendi, a human being, in a manner unknown to the Grand jury at this time." Hinton contended in support of his general demurrer in the trial court and on appeal that the absence of either language or facts indicating whether the malice alleged was express or implied rendered the indictment subject to demurrer. That same argument was rejected by this Court in *Frazier v. State*, 257 Ga. 690 (5) (362 SE2d 351) (1987).

In the special demurrer to the malice murder count, Hinton contended the indictment did not give enough information to enable him to defend against the charge, specifically because the indictment did not allege the manner in which Melendi was killed. "An indictment which charges a defendant with the commission of a crime in the language of a valid statute is sufficient to withstand a demurrer charging that the indictment is insufficient to charge the defendant with any offense under the laws of this state. [Cits.]" *Stewart v. State*, 246 Ga. 70, 72 (2) (268 SE2d 906) (1980). Comparing the language of the indictment with that of OCGA § 16-5-1 (a) ("A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being."), it may be seen that the indictment in this case tracked the language of the statute and was, therefore, sufficient. Id. Contrary to Hinton's arguments here and below, the fact that the indictment did not set out facts showing how Hinton caused Melendi's death does not render the indictment insufficient. "An indictment failing to specify the cause of death is sufficient 'when the circumstances of the case

will not admit of greater certainty in stating the means of death.' [Cits.]" *Phillips v. State*, 258 Ga. 228 (1) (367 SE2d 805) (1988).

4. In support of its theory that Melendi's unexplained absence was due to her murder rather than her effort to avoid problems, the State offered and the Court admitted over defense objections correspondence between Melendi and friends and family, mainly cards and letters to Melendi. The purpose of the evidence was to show Melendi had strong ties to family and friends that made her voluntary disappearance unlikely. Hinton contends on appeal the evidence had no relevance and was prejudicial because it tended to arouse sympathy for Melendi and the witnesses.

"Relevancy is determined by answering the following question: '(D)oes the evidence offered render the desired inference more probable than it would be without the evidence[?]' [Cits.]" *Smith v. State*, 255 Ga. 685, 686 (2) (341 SE2d 451) (1986). In a case such as the present where the victim's body has not been found, evidence that the victim was a person with personal relationships that uncharacteristically seemed to have been abandoned supports a finding that the victim has died by criminal means. *Richardson v. State*, supra, 276 Ga. 548 (1). Thus, evidence of Melendi's relationships at the time of her disappearance was relevant because it rendered the inference that she was killed more probable than it would be without the evidence.

Where an issue is raised whether the probative value of evidence is outweighed by its tendency to unduly arouse the jury's emotions of prejudice, hostility, or sympathy, a trial court's decision regarding admissibility is a matter of discretion. *Smith v. State*, supra, 255 Ga. 685 (2). Considering the circumstances of this case in which there was no body and no crime scene, making it essential that the State employ alternative means of proving the corpus delicti, we see no abuse of discretion in the trial court's decision to permit the State to adduce evidence, in the form of correspondence, supporting the inference that Melendi would not have left friends and family without a word and must, therefore, be dead.

5. During cross-examination of Melendi's acquaintances, Hinton elicited testimony about Melendi's drug and alcohol use, spending habits, financial problems, academic difficulties, and dating patterns to support a defense theory that Melendi either ran away because of stressors in her life or was a victim of foul play by some other person as a result of drug and alcohol use and promiscuity. The State moved in limine to exclude any further evidentiary exploration of Melendi's character and lifestyle. The trial court granted the motion subject to a proffer by the defense showing a factual nexus between Melendi's disappearance and her lifestyle. Hinton argues on appeal that the trial court's exclusion of evidence supporting the defense theory that

she either ran away or was killed by someone else as a result of her drug use or promiscuity was harmful error because it prevented him from countering the State's evidence tending to show Melendi would not run away from her family and friends and thus hampered the presentation of his defense.

> Generally, a murder victim's character is irrelevant and, thus, inadmissible. [Cit.] Evidence that impugns a victim's character cannot be admitted unless it has some factual nexus with the conclusion for which it is being offered. [Cits.] Sheer speculation is insufficient. Otherwise, character evidence would be admitted routinely, disguised as relevant to whatever speculative theory the proponent managed to put forth.

*Roseberry v. State*, 274 Ga. 301, 303 (2) (553 SE2d 589) (2001). The trial court correctly held that Hinton had not shown the evidence he wished to offer had any factual nexus with Melendi's disappearance. A written proffer made pursuant to the trial court's grant of the State's motion in limine consisted solely of statements by Melendi's acquaintances, correspondence, and investigative reports, none of which established any link between Melendi's lifestyle and her disappearance on March 26, 1994. Without such a link, Hinton's theory amounted to sheer speculation and the trial court was correct in excluding the proffered evidence. Id.; *Wayne v. State*, 269 Ga. 36 (5) (495 SE2d 34) (1998) (since defendant failed to show nexus between victim's drug conviction and his murder, theory that unknown person killed victim because of drugs was speculation and exclusion of evidence of drug conviction was not error).

6. Over Hinton's objection, the State was permitted to adduce evidence relating to his attempted rape of his employer's wife in Kentucky and his kidnapping and sexual molestation of his brother's former girlfriend in Illinois. Hinton contends on appeal that admission of the evidence was error because the prior transactions were too remote in time, too dissimilar to each other, and impossible to connect to the present case. The decision of a trial court to admit evidence of similar transactions will be upheld unless clearly erroneous. *Colbert v. State*, 275 Ga. 525 (2) (570 SE2d 321) (2002).

The first prior transaction occurred in 1977, the second in 1982, making the interval between the prior events and the disappearance of Melendi 17 and 12 years. We found an interval of 17 years not to be so great as to require exclusion of similar transaction evidence in *Mullins v. State*, 269 Ga. 157 (2) (496 SE2d 252) (1998). "[T]he lapse of time generally goes to the weight and credibility of the evidence, not to its admissibility. [Cits.] This is especially true where the

accused spent part of the interval incarcerated. [Cit.]" *Swanson v. State*, 269 Ga. App. 826 (605 SE2d 425) (2004). The record shows that Hinton spent some time in prison between the second similar transaction and Melendi's murder, so the interval is decreased even more. Citing *Slakman v. State*, 272 Ga. 662 (4) (a) (533 SE2d 383) (2000), Hinton urges us to measure the interval from the time of the similar transaction events to the time of trial. However, because Hinton spent most of the time between Melendi's murder and the trial in this case in federal prison, the interval remains acceptable. We conclude, therefore, that the evidence of similar transactions was not inadmissible on the basis of remoteness in time.

Hinton contends on appeal the two prior assaults were too dissimilar to each other and, given the vagueness of the indictment, impossible to connect to the present case. "The proper focus is on the similarity, not the differences, between the separate crimes and the crime in question." *Wayne v. State*, supra, 269 Ga. 36, 39 (3). The trial court found the older of the two incidents was similar to the present case in that they both show a pattern of tricking women into vulnerable situations, then restraining them for the purpose of sexual assault. The second incident was considered by the trial court to be similar to the present case in that evidence supported the conclusion that he blamed both incidents on teasing by the women and on a devil inside him, that he tricked both of them into vulnerable situations, that he restrained both women and took them to his home and left them alone part of the time. Based in part on those similarities, the trial court ruled the evidence of those two incidents admissible to show Hinton's plan and scheme, motive, intent and frame of mind, including lustful disposition. Taking into consideration that "[w]hen similar transaction evidence is admitted [to show motive, intent, course of conduct, and bent of mind], a lesser degree of similarity is required than when such evidence is introduced to prove identity [cits.]" (*Smith v. State*, 273 Ga. 356, 357 (2) (541 SE2d 362) (2001)), we conclude that the trial court's ruling on the admission of similar transaction evidence was not clearly erroneous (*Colbert v. State*, supra) and, therefore, provides no ground for reversal.

7. OCGA § 24-9-84.1 was enacted in 2005 to establish guidelines for the use of criminal convictions to impeach witnesses or defendants who testify. Under subsection (b) of the statute, a conviction more than ten years old may not be used to impeach unless the trial court "determines, in the interest of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Id. The trial court in the present case excluded from evidence some of the convictions Hinton wished to use to impeach two witnesses. Hinton argues on appeal, as he did in the trial court, that the statute is unconstitutional in that it

violates the Confrontation Clause of the U. S. and Georgia constitutions by denying him a thorough and sifting cross-examination.

> The right of cross-examination integral to the Sixth Amendment right of confrontation is not an absolute right that mandates unlimited questioning by the defense. [Cits.] "The Confrontation Clause guarantees 'only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' [Cit.]"

*Watkins v. State*, 276 Ga. 578, 582 (3) (581 SE2d 23) (2003) Our inquiry, therefore, is whether the challenged statute denies an opportunity for effective cross-examination.

The General Assembly, in enacting the statute at issue, chose to use the language of Federal Rules of Evidence Rule 609 (b). In considering that rule, the United States Court of Appeals for the Fifth Circuit recognized that "in the Senate Report on the Rules of Evidence, the Senate noted that 'convictions over ten years old generally do not have much probative value.' [Cit.] The presumption against admissibility is, therefore, founded on a legislative perception that the passage of time dissipates the probative value of a prior conviction." *United States v. Cathey*, 591 F2d 268, 275 (5th Cir. 1979). In reviewing an identical rule, the Washington Court of Appeals noted that "[r]eason dictates that the older such a conviction becomes, the less probative value it likely will have." *State v. Jones*, 117 Wash. App. 221, 233 (70 P3d 171) (2003). To the extent evidence is wanting in probative value, cross-examination intended to adduce such evidence cannot reasonably be considered effective.

It must be remembered that the challenged statute does not cut off all cross-examination regarding witnesses' convictions, or even all cross-examination regarding convictions more than ten years old. By its terms, the statute authorizes the trial judge to admit such evidence when it "determines, in the interest of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." OCGA § 24-9-84.1 (b). In the present case, the trial court permitted the defense to introduce convictions older than ten years which related to the witnesses' presence in prison when Hinton was there, and offered to admit other convictions if Hinton could show they were used to enhance a witness's federal sentence.

Based on the slight probative value of over-age convictions, the fact that the challenged statute permits use even of such convictions upon a showing of specific facts and circumstances establishing the probative value of the particular conviction, and the fact that the

statute does not preclude all inquiry on a subject with respect to which a defendant is entitled to a reasonable cross-examination (*Watkins v. State*, 264 Ga. 657 (1) (b) (449 SE2d 834) (1994)), the statute is not unconstitutional as a violation of the Confrontation Clause.

8. Hinton complains the warrants for two searches of his home and car were not supported by probable cause and that he was prejudiced by the admission into evidence of tape seized in the first search. This Court's duty in reviewing the magistrate's decision to issue a search warrant is to determine whether the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrants. *Lemon v. State*, 279 Ga. 618 (1) (619 SE2d 613) (2005). Here, the affidavit in support of the first search warrant set forth the circumstances of Melendi's unscheduled departure from the SBCC in close temporal proximity to Hinton's departure after both had worked the same softball game; the discovery of her car apparently abandoned at a service station next to the SBCC; the two telephone calls about Melendi by a person fitting Hinton's characteristics, in both of which calls the caller asserted he had "the missing girl"; the discovery of Melendi's ring near the payphone from which the second call was made; and Hinton's history of assaults on females, including the fact that he had previously abducted a victim and secreted her in his home. Our review of the record persuades us the magistrate had a substantial basis for concluding there was probable cause that evidence pertaining to Melendi's disappearance would be found in Hinton's home. Thus, we find no error in the trial court's denial of Hinton's motion to suppress the fruits of the search conducted pursuant to the first search warrant.

As to the second search, we note that Hinton does not complain about the admission of any evidence seized in that search. That being so, there is no reason for appellate review of the legality of that search. See *Lawler v. State*, 276 Ga. 229 (4) (g) (576 SE2d 841) (2003); *McDowell v. State*, 239 Ga. 626 (2) (238 SE2d 415) (1977).

*Judgment affirmed. All the Justices concur, except Melton, J., not participating.*

DECIDED JUNE 12, 2006 —
RECONSIDERATION DENIED JULY 17, 2006.

*Brenda J. Bernstein*, for appellant.
*Gwendolyn Keyes Fleming*, District Attorney, *Leonora Grant*, Assistant District Attorney, *Thurbert E. Baker*, Attorney General, *Vonnetta L. Benjamin*, Assistant Attorney General, for appellee.