A06A0592. THE STATE v. DIXSON.
(633 SE2d 636)

PHIPPS, Judge.

After being charged with two counts of violating the Georgia Controlled Substances Act, Richard Dixson filed a motion to suppress evidence seized during a traffic stop. The trial court conducted an evidentiary hearing, and then granted Dixson's motion to suppress. The state claims that the traffic stop was legal and that Dixson's arrest was supported by probable cause. We conclude that the initial stop was improper and therefore affirm.

We must abide by three principles when reviewing the grant of a motion to suppress:

> First, the judge sits as the trier of facts. The trial judge hears the evidence, and his findings based upon conflicting evidence are analogous to the verdict of a jury and should not be disturbed by a reviewing court if there is any evidence to support it. Second, the trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous. Third, the reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment.[1]

The following testimony was presented at the motion to suppress hearing by the arresting officer; no one else testified. On October 13, 2004, Officer Sergey Voronkov was on routine patrol and decided to run a check with the National Crime Information Center (NCIC) on the car in front of him, which was being driven by Dixson. The NCIC check revealed an "unknown" insurance status. Voronkov then turned on his blue lights and siren to stop the car. Dixson continued at a low rate of speed for approximately 75 yards before pulling into a driveway and stopping. He then got out and remained in the doorway of the car. At that point, Voronkov realized that there was a passenger in the

---

[1] *State v. Ellison*, 271 Ga. App. 898 (1) (611 SE2d 129) (2005) (citation and punctuation omitted).

car. Voronkov immediately called for backup and told Dixson to get back in his car. As Voronkov approached the car, Dixson handed him his driver's license and proof of insurance. Voronkov testified that he smelled a strong odor of burning marijuana. When he asked Dixson if he had been smoking marijuana, Dixson said that he had done so earlier. Several officers arrived as backup and another officer asked the passenger to get out of the car. Voronkov saw the other officer reach into the center console area between the front seats and pull out a white chalky substance, which tested positive for cocaine. Voronkov never saw the cocaine before the other officer pulled it out. The officers found marijuana on the ground next to the passenger. When Dixson was arrested, he said that all of the drugs were his.

Voronkov testified that he did not witness Dixson commit any traffic violations before he stopped the car. Voronkov never did check the status of Dixson's insurance. He testified that, although Dixson presented an insurance card, "you actually have to call the insurance company in order to find out whether it's valid or not because they could cancel it."

The trial court ruled that the arresting officer lacked reasonable, articulable suspicion to stop Dixson and that he also lacked probable cause to arrest Dixson after the initial illegal stop.

The Fourth Amendment applies to seizures of the person, including brief investigatory stops such as the stop of Dixson's car here.[2] "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."[3] That determination can only be made after considering the totality of the circumstances or the whole picture. Based upon that whole picture, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."[4] Investigative stops of vehicles based solely on unparticularized suspicion or hunch are invalid.[5] "The state bears the burden of presenting evidence that demonstrates a reasonable suspicion of criminal activity."[6]

In *Delaware v. Prouse*,[7] the United States Supreme Court held that stopping a vehicle and detaining the driver to check his driver's license and registration is unreasonable under the Fourth Amendment, unless there exists an articulable and reasonable suspicion that the driver is unlicensed or the vehicle is unregistered or that the

---

[2] *United States v. Cortez*, 449 U. S. 411, 417 (101 SC 690, 66 LE2d 621) (1981).
[3] Id. (citations omitted).
[4] Id. at 417-418.
[5] *Duke v. State*, 257 Ga. App. 609 (571 SE2d 414) (2002).
[6] Id. at 610 (citation omitted).
[7] 440 U. S. 648 (99 SC 1391, 59 LE2d 660) (1979).

driver or vehicle is otherwise subject to seizure for violation of the law.[8] Logically, the same rule would apply to stopping a vehicle and detaining the driver to check the insured status of the vehicle.

In *Self v. State*,[9] this court recognized that where a law enforcement officer "checked [a computer database for] the vehicle's license tag prior to stopping it and determined that the tag belonged to [another vehicle]," those facts supported the stop of the vehicle. But the investigatory stop was upheld as valid only when additional facts were considered: the vehicle had been described by the victims of the crime; police officers had been notified that the vehicle was back at the crime scene, had located it within moments of being notified of its whereabouts and had observed unusually slow movements by the vehicle.[10] Here, the record does not show that the state database provided the officer with any specific articulable facts that would create a reasonable suspicion that Dixson was engaged in criminal conduct. And, unlike the *Self* case, there are no other facts in the record that would support the validity of the stop.

To improve the enforcement of minimum motor vehicle liability insurance requirements, the State of Georgia maintains a database to which insurers provide information regarding the insured status of vehicles registered in Georgia, and that information is accessible to law enforcement officers throughout the state.[11] If a Georgia law enforcement officer determines that the owner or operator of a motor vehicle for which minimum motor vehicle liability insurance coverage is required does not have proof or evidence of required minimum insurance coverage, the officer is authorized to issue a uniform traffic citation for operating a motor vehicle without proof of insurance.[12] However, a law enforcement officer is not authorized to issue a uniform traffic citation solely because the officer is unable to obtain insurance coverage information from the state database.[13]

Here, Voronkov testified that he stopped Dixson solely because his check of Dixson's car tag revealed an "unknown" insurance status. Voronkov did not testify that an "unknown" status likely meant that Dixson's car was uninsured. Nor did he testify about any prior experience or training he had with such a response from an NCIC search or why the database might produce such a response. Voronkov did not observe Dixson commit any traffic violations, and Voronkov was not authorized to issue Dixson a citation solely because he was

---

[8] Id. at 663.
[9] 245 Ga. App. 270, 274 (3) (a) (537 SE2d 723) (2000).
[10] Id.
[11] See OCGA § 40-6-10 (a) (3), (e); Ga. L. 2000, p. 429, § 1.
[12] OCGA § 40-6-10 (a) (6).
[13] OCGA § 40-6-10 (b).

unable to verify his insured status through the database. We conclude that the state, relying solely on an "unknown" response from a database, has failed to show specific articulable facts sufficient to raise a reasonable suspicion that Dixson was engaged in criminal conduct.[14] Under these circumstances, Voronkov was not authorized to stop Dixson's car.[15] The subsequent search was therefore tainted, and the trial court properly suppressed its results.[16]

The state argues that an "unknown" registration status would create a reasonable suspicion authorizing the investigatory stop of a vehicle and that an "unknown" insurance status should do the same. The state relies on *State v. Joyner*,[17] but that reliance is misplaced as *Joyner* specifically did not decide whether an initial traffic stop based on a questionable registration status was legal.[18] Instead, *Joyner* concluded that the challenged evidence was obtained during an illegal detention and upheld the trial court's grant of the defendant's motion to suppress on that basis.[19]

The dissent takes the position that a "questionable notation" in the state's computer database, without more, justified the investigatory stop of Dixson's vehicle. Before the computer database became available, a law enforcement officer could not stop a vehicle solely to check its insured status despite the fact that that status was unknown. The creation of the database does not alter the rule that an investigatory stop must be justified by some objective manifestation that the person stopped is engaged in criminal activity. The computer's return of "unknown" in response to a query regarding the insured status of a vehicle does not create a reasonable suspicion of criminal activity. There are no facts in the record indicating that a return of "unknown" makes it any more likely that a vehicle is uninsured rather than fully insured. Instead of speculating about what might have caused the response of "unknown," we are required to determine whether the state has met its burden of proving that such a response created a reasonable suspicion of criminal conduct. The dissent seems willing to dispense with that requirement merely because law

---

[14] See *Duke,* supra at 611 (state failed to present evidence that 911 dispatch, which formed sole basis for traffic stop, was based on specific, articulable facts that gave rise to reasonable suspicion of criminal activity).

[15] See *Berry v. State,* 248 Ga. App. 874, 880-881 (3) (547 SE2d 664) (2001) (traffic stop was not authorized where officer stopped driver because he had drive-out tag and officer testified it was common for stolen cars to have drive-out tags).

[16] See *Duke,* supra.

[17] 270 Ga. App. 533 (607 SE2d 184) (2004).

[18] Id. at 534.

[19] Id.

enforcement officers now rely on the computer database instead of insurance cards. That cannot have been an intended result of the database's creation.

Finally, we must disagree with the dissent's suggestion that an investigatory stop can be justified as a "courtesy stop" to alert a driver that there may be a problem with his or her insurance. The use of such a label does not exempt state action from Fourth Amendment scrutiny. In *Delaware v. Prouse*,[20] the Supreme Court plainly stated that "[t]he Fourth and Fourteenth Amendments are implicated . . . because stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of those Amendments, even though the purpose of the stop is limited and the resulting detention quite brief."[21] Moreover, the owner of a car "knows" whether his or her car is insured and needs no "courtesy stop" by a law enforcement officer to provide that information.

*Judgment affirmed. Ruffin, C. J., Johnson, P. J., and Bernes, J., concur. Barnes, J., concurs specially. Andrews, P. J., and Smith, P. J., dissent.*

BARNES, Judge, concurring specially.

Although I concur fully with all that is said in the majority opinion, I write separately to express my concern over the practice of police officers randomly, and apparently without any justification, checking license tags of lawfully driving motorists through the National Crime Information Center. I am not aware of anything in our law that would justify such a practice.

Moreover, the practice is not authorized by OCGA § 40-6-10, the governing Code section. Instead, OCGA § 40-6-10 (a) (5) directs that

> [e]very law enforcement officer in this state shall determine if the operator of a motor vehicle subject to the provisions of this Code section has the required minimum insurance coverage *every time the law enforcement officer stops the vehicle or requests the presentation of the driver's license of the operator of the vehicle.*

(Emphasis supplied.) Nothing in this Code section contemplates the practice employed by the officer in this case. Contrary to the State's argument, if the General Assembly wanted police to have the option of checking the insurance status of every driver on the road, it could have done so. That it failed to do so indicates that the General Assembly intended to allow drivers to retain some modicum of

---

[20] Supra.

[21] Id. at 653 (citations omitted).

privacy while operating their vehicles lawfully on the public roadway. Accordingly, in addition to the reasons stated in the majority opinion, I would affirm the trial court because the officer had no authority to conduct the National Crime Information Center check in the first instance.

SMITH, Presiding Judge, dissenting.

I respectfully dissent. Because the law requires reliance on the Department of Motor Vehicle Safety (DMVS) computer database in order to verify the insurance status of Georgia motorists, a questionable notation in that database provided sufficient basis for a brief investigative stop of Dixson's car. I therefore would reverse the trial court's grant of Dixson's motion to suppress.

The Georgia Code provides that the burden is on the owner of a motor vehicle to provide "satisfactory proof that the motor vehicle is subject to a policy of insurance." OCGA § 40-2-26; see also OCGA § 40-6-10. While former law relied upon a system of identification cards carried by the owner/driver in the vehicle or on his person, as is still required for a driver's license and vehicle registration, the scheme in effect since January 1, 2004 relies upon the DMVS computer database. Compare OCGA § 40-6-10 (a) (1) with OCGA § 40-6-10 (a) (3).

The database is therefore the legal method by which insurance coverage is verified, and an "unknown" insurance status raises, at a minimum, a suspicion that the owner has failed to provide proof of coverage as required by law. It could well be that the "unknown" status is the result of a computer "glitch" or data entry error by DMVS personnel, but the officer is certainly justified in investigating further to find the reason for the owner's apparent violation of the law in failing to provide adequate proof of insurance.

While cases such as *Berry v. State*, 248 Ga. App. 874 (547 SE2d 664) (2001), cited by the majority, prohibit a stop on the "mere hunch" that a vehicle with a perfectly legal drive-out tag "might be stolen," id. at 880-881 (3), our other decisions in this area make plain that a drive-out tag may provide sufficient basis for a stop if it gives *some indication that it is invalid,* such as a faded or weathered appearance. *Bius v. State*, 254 Ga. App. 634, 636 (2) (563 SE2d 527) (2002). A questionable notation in a database therefore should provide a "particularized and objective basis" for a stop. Id. The majority's observation that a law officer could not, before the advent of the database, stop a vehicle in order to check its insurance status in essence points up the utility of this information for law enforcement. Before the database, such a stop would have been based upon no facts and made completely at random.

In addition, unlike the officer in *Delaware v. Prouse*, 440 U. S. 648 (99 SC 1391, 59 LE2d 660) (1979), cited by the majority, the police officer here did not *stop* Dixson's vehicle in order to check his driver's license and registration. Before stopping the vehicle or making any contact with the driver, he simply observed the vehicle's license plate, which was on public display, and checked his insurance status using that information. The driver of a vehicle has no privacy interest in the license plate; the entire purpose of the plate is to provide a positive and public identification of the vehicle. OCGA § 40-2-41. In *Self v. State*, 245 Ga. App. 270, 274 (3) (a) (537 SE2d 723) (2000), a police officer checked a vehicle's license plate before stopping it and found that it was registered to another vehicle. We expressly held that "the potential violation of OCGA § 40-2-6 supported the stop of the vehicle." Id. We then went on to lay out an alternative and independent basis for the stop in the description and location of the vehicle, but nowhere in the opinion did we qualify our original holding as dependent upon other factors, as suggested by the majority. *Prouse* therefore offers no guidance here.

While an officer may not issue a citation for an insurance violation based solely on the database, the statutory prohibition of a citation does not affect whether the database can provide an articulable suspicion upon which to base a *Terry* stop. Otherwise, the database would appear to be largely ineffective because the officer cannot use the information it provides. If he stops the car and the driver has no "proof or evidence" of insurance, the officer is to write a citation. OCGA § 40-6-10 (a) (6). But he cannot confirm insurance, or the lack of it, unless and until he stops the car. Moreover, such a stop could be considered a "courtesy stop" in that it may alert the driver to a problem with his insurance status before he is involved in an accident or stopped for some other reason and then cited for failing to have insurance.

For these reasons, I respectfully dissent.

I am authorized to state that Presiding Judge Andrews joins in this dissent.

DECIDED JULY 5, 2006 — ■

Gwendolyn Keyes Fleming, District Attorney, Leonora Grant, Assistant District Attorney, for appellant.

Priya N. Lakhi, Therese M. Allen, for appellee.