**SECOND DIVISION**
**BARNES, P. J.,**
**ADAMS and MCFADDEN, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

June 15, 2012

# In the Court of Appeals of Georgia

A12A0063. MARTIN v. THE STATE.                    AD-003C

ADAMS, Judge.

James W. Martin, Jr. appeals the trial court's order denying his motion to suppress evidence seized from his truck. For the following reasons, we reverse.

The proper standard of review was recently reiterated by the Supreme Court:

(W)hen a motion to suppress is heard by the trial judge, that judge sits as the trier of facts.... (T)he trial court's decision with regard to questions of fact and credibility must be accepted unless clearly erroneous.... (T)he reviewing court must construe the evidence most favorably to the upholding of the trial court's findings and judgment. [Cit.] However, as a reviewing court, "(we) owe no deference to the trial court's conclusions of law. Instead, we are free to apply anew the legal principles to the facts." [Cit.]

*Clay v. State*, _ Ga. _ (2) (Case No. S11A1956, decided March 19, 2012).

The record, including a videotape of the incident, shows that at approximately 2:20 a.m. on January 4, 2010, Walton County Sheriff's Deputy Yarbrough spotted Martin's truck parked behind a closed funeral home with the engine running and the passenger door one-quarter open. The deputy decided to investigate, and after parking his patrol car and approaching on foot, he saw two people inside the truck. Yarbrough was initially concerned for the occupants' welfare – it was 19 degrees outside and neither person appeared to be breathing – and he thought for a moment that Martin was dead. In fact, the occupants were asleep, and Martin woke up when Yarbrough tapped on the window. Martin then woke up the woman in the driver's seat. Yarbrough testified that Martin and the woman appeared lethargic and sluggish, their speech was slurred, their eyes were glassed over, and they were not able to answer questions as quickly as the deputy would have expected a person to be able to do.

Yarbrough confirmed the occupants' identities and asked what they were doing parked behind the funeral home. Martin and the woman said that they had no place to stay, that they got tired, and they were there to take a nap. Martin said that he lived in the truck, and he explained that the owner of the funeral home had given him permission to park there and rest. The deputy realized that he knew Martin had a pending charge of drug possession; he also had information "from another source"

that Martin was possibly selling methamphetamine in another area of Walton County. But the dispatch center reported that a computer check revealed no outstanding warrants for Martin, and his license "came back clean" at about four minutes and fifteen seconds into the stop. Yet Yarbrough called for a second deputy, And at about six to eight minutes into the stop, Deputy Stowe arrived.

Yarbrough then asked Martin and the woman if there were any narcotics in the vehicle. He explained:

> I asked them if there was anything illegal in the vehicle because I had concerns that, just based off their manifestations of how they were acting and that they were real, real sluggish, slow to respond, and I had asked them if there was anything illegal in the vehicle because *I had a feeling* that there was possibly, they were either using narcotics or that maybe there was narcotics in the vehicle. [And] [b]ased off my prior knowledge of Mr. Martin and having the one possession charge and also the information I'd been receiving.

(Emphasis supplied.) The couple denied having any narcotics in the truck. At a little over eight minutes into the stop Yarbrough then asked for permission to search; Martin replied that without a warrant he did not want the officer to search his truck. After the refusal, about 11 minutes into the stop, Yarbrough inquired as to whether a K-9 unit was available. Three or so minutes later, the officer said that although he

could not smell anything in the vehicle, "If it's anything, he's going to have meth in the vehicle." He testified, "*I had a feeling* that there was something going on other than just the fact that they were sleeping there." (Emphasis supplied.) He testified that although the couple had just woken up and their demeanor could be consistent with someone who had just been in a deep sleep, Martin's demeanor never really changed during the encounter; he continued to be slow to answer questions, and his speech was "slurred a little bit."

At about 2:33 a. m.,[1] Yarbrough asked the dispatch officer to contact the owner of the funeral home to confirm whether he had given Martin permission to park there, and at about 2:38 a. m., dispatch reported back that it left a message for the owner. During this latter exchange, Yarbrough formally requested that a K-9 officer be called. Four minutes later (about 2:43 a. m.), dispatch reported to Yarbrough that the owner called and confirmed that Martin had permission to sleep there. Yarbrough testified that at this point, however, Martin was not free to leave because he was continuing to investigate the possibility of the presence of narcotics.

---

[1] The trial court found that this occurred at 2:38 a. m., about 19 minutes into the encounter. But the video shows that the request was made at an elapsed time of approximately 13 minutes into the encounter.

4

At about 2:44 a. m., the officer reported over the radio that "he wanted it noted that it was obvious that [Martin] was under the influence of something." Yarbrough confirmed during his testimony that he first commented that Martin appeared to be on drugs after dispatch confirmed that Martin had permission to be parked behind the funeral home. At about the same time, a K-9 officer left for the scene, and Yarbrough was told that the K-9 officer was expected to arrive in about 20 minutes. Martin went back to sleep in his truck briefly while everyone was waiting on the K-9 officer to arrive. The K-9 officer arrived between 25 and 28 minutes later, or almost 53 minutes into the encounter. The K-9 officer indicated that the dog alerted, and a subsequent search of the vehicle revealed suspected methamphetamine residue. Martin was arrested and placed in custody at 3:26 a.m. [2]

1. The trial court found that the event began as a first tier encounter but that by the time the deputy had called for the K-9 officer to be dispatched, the defendant was no longer free to leave, and therefore a second tier encounter was underway. The court found that by that time, Yarbrough had a reasonable and particularized suspicion that Martin and the driver were under the influence of some drug for these

---

[2] Other than as noted in footnote 1, the trial court's findings of fact are almost totally in accord with this recitation of the evidence.

reasons: Yarbrough had discovered them asleep at 2:20 a. m. in a deserted parking lot of a funeral home; it was well below freezing; one door was open; Martin and the driver "were notably sluggish, their speech was slurred; they had difficulty answering questions as quickly as a non-intoxicated person in the same situation. . ."; and Yarbrough had knowledge of Martin's criminal history and reputation as a drug dealer and user. The court added,

> Therefore, regardless of the point at which the encounter shifted from a first tier to a second tier encounter, after the deputy had spoken with [Martin] and the driver and obtained their identification, he had reasonable suspicion that they were under the influence of drugs and might still be in possession of drugs.

The record supports the court's finding that the second tier encounter began when Yarbrough formally called for a K-9 unit at 2:38 a. m., which was about 18 minutes into the stop; Yarbrough essentially testified to as much. See generally *In the Interest of D. H.*, 285 Ga. 51, 53 (2) (673 SE2d 191) (2009) (re: three types of police-citizen encounters). But even construing the evidence most favorably to upholding the trial court's decision, we disagree with the legal conclusion that "after the deputy had spoken with [Martin] and the driver and obtained their identification," or by 2:38

6

a. m., Yarbrough had a reasonable suspicion that Martin was in possession of illegal drugs.

A second-tier, investigatory detention was authorized "'if based on the totality of the circumstances [the officer] had specific and articulable facts which, taken together with rational inferences from those facts, gave [him] a particularized and objective basis for suspecting [Martin] of criminal activity.' [Cit.]" *State v. Hopper*, 293 Ga. App. 220, 222 (666 SE2d 735) (2008). See also *Jones v. State*, _ Ga. _ (2) (Case No. S11G1054, decided May 7, 2012). By 18 minutes into the encounter, Yarbrough knew the following information: (1) Martin and his companion were dead asleep in a running truck with one door ajar at 2:20 a. m. on a very cold night in a funeral home parking lot; (2) the couple claimed that they had no other place to stay and that they had permission of the owner to park and sleep there; (3) when they woke up and thereafter, the couple appeared lethargic and sluggish and they had slurred speech, were groggy, glassy-eyed, and slow to respond; and (4) Martin had a pending charge of possession and there was hearsay regarding Martin possibly selling methamphetamine at some other location. Yarbrough also knew that a computer check of Martin's and his companion's licenses and registration were in order; he had not smelled any odors or seen any substances inside or outside of the

7

truck suggesting illegal activity; Martin was not in the driver's seat; and Martin denied consent to search the truck. Within four more minutes, Yarbrough also knew that Martin had permission from the owner of the funeral home to park and sleep on the premises.[3]

Applying the proper legal principles to this case, and considering the totality of the circumstances, we conclude that when the officers detained Martin after they knew that he had permission to be sleeping in his truck in the funeral home parking lot, they did not have an articulable suspicion, i.e., an "objective manifestation," that Martin was or was about to be engaged in criminal activity. See *State v. Dixson*, 280 Ga. App. 260, 261 (633 SE2d 636) (2006). Once the unusual circumstances were clarified, and setting aside his prior knowledge of Martin, all Yarbrough had was Martin's and his companion's appearance and demeanor, which, Yarbrough admitted, could be consistent with someone being woken up from a deep sleep. Although this demeanor led Yarbrough to conclude that Martin might be on something, he twice characterized his conclusion as "a feeling." But "[t]o stop a citizen, the officer must

---

[3] There is no testimony that Martin fell asleep within the first 18 minutes of the encounter. In fact, Yarbrough testified that this occurred while everyone waited on the K-9 officer to arrive.

possess more than a subjective, unparticularized suspicion or hunch." *Black v. State*, 281 Ga. App. 40, 43 (1) (635 SE2d 568) (2006).

Yarbrough did not see or smell any illegal substances; he did not question Martin regarding his appearance or demeanor; he did not determine whether Martin had taken prescription or over the counter medication that may cause drowsiness; he did not determine if Martin had consumed alcohol; he did not describe Martin's appearance or demeanor as being specifically indicative of intoxication by an illegal substance, as opposed to a legal substance; and he did not perform any field tests to determine if Martin was under the influence of anything. Cf. *Bell v. State*, 295 Ga. App. 607, 609-610 (2) (672 SE2d 675) (2009) (this Court discounted an officer's observation that the defendant, who had been driving, appeared to be "under the influence of some type of drug" given that the officer never intended to charge him with DUI and performed no field sobriety tests). Thus, despite the court's conclusion that Yarbrough had a particularized suspicion that Martin was under the influence of "some drug," Yarbrough simply did not have "a particularized and objective basis for suspecting [Martin] of criminal activity." *Dixon*, 280 Ga. App. at 261.

Yarbrough also had some prior knowledge of Martin – he knew that Martin was accused of possessing drugs in a separate incident and he had heard that Martin

might have been involved with illegal drug sales. An officer's knowledge of a suspect's prior similar criminal behavior is relevant to a consideration of probable cause. See, e.g., *Hinton v. State*, 280 Ga. 811, 820 (8) (631 SE2d 365) (2006) (evidence of defendant's prior conviction of kidnapping and indecent liberties was relevant for determining probable cause to search in new allegations that defendant committed kidnapping and murder). And the United States Supreme Court has held that an officer's knowledge of prior arrests for similar conduct may be relevant to a determination of probable cause related to a new incident, even though the same evidence would not be admissible at trial. *Brinegar v. United States*, 338 U. S. 160, 172 (II) (69 SC 1302, 93 LE 1879) (1949). See also *Caffo v. State*, 247 Ga. 751, 755 (2) (c) (279 SE2d 678) (1981) (suspect's past criminal conduct can be used to support probable cause to issue a search warrant).

But in these cases, a similarity was established between the prior conduct and the current circumstances that provided support for the articulable suspicion of a new crime. In *Brinegar*, evidence that the investigating officer had arrested the defendant for illegal transportation of liquor several months earlier was part of the facts and circumstances that the officer could consider when assessing probable cause to search the defendant in a new incident of suspected illegal transportation of contraband. Id.

10

But the officer knew additional information about Brinegar before the stop, including that he had seen Brinegar loading liquor into a vehicle on other occasions over the course of six months prior to the search and that he recognized the car as one Brinegar had used during that time. This information gave the officer "positive and convincing evidence that Brinegar was engaged in [illegal transportation of liquor]" at the time of the search and information that linked the officer's knowledge of Brinegar's earlier arrest to this incident. Id. at 170.

In *Hinton*, evidence that the defendant had a "history of assaults on females, including the fact that he had previously abducted a victim and secreted her in his home" was considered as part of the support for a finding of probable cause to search the defendant's home and car in a new incident involving the abduction and murder of a young woman. *Hinton*, 280 Ga. at 820 (8). But that information was combined with other information placing the defendant in close proximity with the victim, as well as two telephone calls about the victim by a person fitting the defendant's description. Id. See also *Cafo*, 247 Ga. at 754 (2) (b) (in addition to defendant's prior criminal record, officers had information showing defendant saw victim on night of the crime near where victim's vehicle was found and that defendant had items in his car similar to one found on the victim's body).

11

Here, there is no evidence that Martin had ever used drugs before and therefore no evidence of use of a particular drug. And although he had been arrested for possession of illegal drugs, we conclude that a past *arrest* for possession, without more is simply not enough to provide reasonable articulable suspicion that the person is currently in possession. To hold otherwise would justify the authorities to conduct a second tier detention, including a dog-sniff test, of any person previously arrested for possession. Finally, although Yarbrough was aware of hearsay information that Martin had been selling methamphetamine, without any information about the reliability of the source of that information, it cannot be considered.[4]

We conclude that in this case, the officer simply did not have sufficient information as a matter of law to establish reasonable suspicion that Martin was engaged in or about to be engaged in a violation of the law. Accordingly, the trial court erred by denying the motion to suppress, and we reverse that decision. See *Bell*, 295 Ga. App. at 612.

---

[4] "[H]earsay is admissible in determining the existence of probable cause," *Banks v. State*, 277 Ga. 543, 544 (1) (592 SE2d 668) (2004), but without sufficient indicia of reliability, anonymous information does not provide reasonable suspicion of criminal activity. *Florida v. J. L.*, 529 U. S. 266, 270 (II) (120 SC 1375, 146 LE2d 254) (2000). See, e.g., *State v. Dukes*, 279 Ga. App. 247, 250 (630 SE2d 847) (2006) ("record is devoid of any evidence about the details of the report of drug activity received by the patrol officer"). Similarly, in this case, no basis for crediting the hearsay was offered.

12

*Judgment reversed. Barnes, P. J., and McFadden, J., concur.*