[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 14-10681

————————————————

D.C. Docket No. 5:10-cv-00489-MTT

MARION WILSON, JR.,

Petitioner–Appellant,

versus

WARDEN, GEORGIA DIAGNOSTIC PRISON,

Respondent–Appellee.

————————————————

Appeal from the United States District Court
for the Middle District of Georgia

————————————————

(December 15, 2014)

Before ED CARNES, Chief Judge, and WILLIAM PRYOR and JORDAN, Circuit
Judges.

WILLIAM PRYOR, Circuit Judge:

Marion Wilson, Jr., a Georgia prisoner sentenced to death for the murder of

Donovan Corey Parks, appeals the denial of his petition for a writ of habeas

corpus. Wilson argues that he was deprived of a fair trial because his counsel

provided ineffective assistance during the penalty phase of his trial. In state postconviction proceedings, Wilson argued that his trial counsel were constitutionally ineffective because they failed to discover and introduce mitigating evidence. The state trial court ruled that Wilson's claim of ineffective assistance of counsel failed, and the Supreme Court of Georgia declined to review that decision. Because the Supreme Court of Georgia could have reasonably concluded that counsel provided Wilson effective assistance, we affirm the denial of Wilson's petition for a writ of habeas corpus.

## I.    BACKGROUND

We divide our discussion of the background in two parts. First, we discuss the facts of Parks's murder and the evidence presented at Wilson's trial. Second, we discuss the additional evidence presented during Wilson's state habeas proceeding.

### A.  *Wilson is Convicted of Malice Murder and Sentenced to Death.*

In 1996, Marion Wilson, Jr. and Robert Earl Butts killed Donovan Parks in Milledgeville, Georgia. *Wilson v. State*, 525 S.E.2d 339, 343 (Ga. 1999). Wilson and Butts approached Parks in a Wal-Mart parking lot to ask for a ride. *Id.* Wilson, Butts, and Parks then entered Parks's automobile. *Id.* A few minutes later, Parks's dead body was found nearby on a residential street. *Id.* Parks's clothing was saturated with blood, and he had a "gaping" hole in the back of his head. His skull

2

was filled with metal shotgun pellets and a spent shotgun shell, which suggested that he was shot at close range.

After officers arrested Wilson, he told the officers that after Parks got in the automobile, Butts pulled out a sawed-off shotgun and ordered Parks to drive around. *Id.* According to Wilson, Butts later told Parks to exit the automobile and lie on the ground, after which Butts shot Parks in the back of the head. *Id.* Wilson and Butts drove Parks's automobile to Atlanta in an attempt to locate a "chop shop" to dispose of the automobile. *Id.* They were unable to find a "chop shop" so they purchased gasoline cans, drove to Macon, and burned the automobile. *Id.* Police later searched Wilson's residence and found a "sawed-off shotgun loaded with the type of ammunition used to kill Parks" and notebooks filled with handwritten gang creeds and symbols. *Id.*

At trial, Wilson was represented by two appointed attorneys, Thomas O'Donnell Jr., who served as lead counsel, and Jon Philip Carr. *Wilson v. Humphrey*, No. 5:10-CV-489 (MTT), 2013 WL 6795024, at *10 (M.D. Ga. Dec. 19, 2013). They argued that Wilson was "mere[ly] presen[t]" during Butts's crimes, *id.* at *34, but the jury convicted Wilson "of malice murder, felony murder, armed robbery, hijacking a motor vehicle, possession of a firearm during the commission of a crime, and possession of a sawed-off shotgun," *id.* at *2.

During the penalty phase, defense counsel argued that the jury should not sentence Wilson to death because there was residual doubt about his guilt. *Id.* at *16. They presented evidence that Butts gave inconsistent statements to the police and that Butts confessed to three other inmates that he was the triggerman. Trial counsel again tried to convince the jury that Wilson was "mere[ly] presen[t]" during the crimes.

Trial counsel introduced testimony from Wilson's mother, Charlene Cox. She testified that Wilson had a difficult childhood and did not deserve to die even though he had a history of criminality. She explained that Wilson's father played no role in Wilson's upbringing, that she supported Wilson by working low-wage jobs, and that Wilson had an 18-month-old daughter.

Trial counsel also introduced testimony from Dr. Renee Kohanski, a forensic psychiatrist. *Id.* at *20. Kohanski relied on the records defense counsel requested from agencies, schools, and medical facilities, and interviewed Wilson to create a "cursory" social history, but she did not conduct an independent investigation of Wilson's background. *Id.* at *20–21. Kohanski testified that Wilson had a difficult, sickly, and violent childhood. She explained that Wilson was so aggressive as a child that his elementary school performed a psychological assessment of him. *Id.* at *25. The assessment found that Wilson had difficulty staying on task, a poor self-image, and an "excessive maternal dependence." *Id.* Kohanski told the jury

4

that school officials also requested a medical evaluation because they suspected that Wilson suffered from an attention deficit disorder, but testing was never performed. *Id.* She testified that Wilson had no parental support or male role model, and that, by age 9 or 10, he fended for himself on the streets and joined a gang as a substitute for a family. *Id.* Kohanski told the jury that Cox's boyfriends "came and went" and frequently used drugs. *Id.* Kohanski testified about one "not . . . uncommon event" in which six- or seven-year-old Wilson witnessed Cox's "common law" husband hold a gun to Cox's head. *Id.*

On cross-examination, both Cox and Kohanski testified about unfavorable background evidence. Cox admitted that Wilson was incarcerated for every day of his daughter's life, *id.* at *26, and that Cox had difficulty raising Wilson and sometimes needed police assistance to control Wilson. Kohanski told the jury that Wilson is of average intelligence and suffers from no known brain damage, but that he was in two car accidents as a child and she "would have been interested to see [brain imaging scans from] that time" to look for brain damage. She also testified that, regardless of any possible brain damage, Wilson knew right from wrong at the time of the murder.

The prosecution then presented evidence of Wilson's extensive criminal history. The jury heard that, from the age of 12 years, Wilson was "either out committing crimes or . . . incarcerated somewhere." *Id.* at *22. The jury heard that

5

Wilson had been charged with first degree arson, criminal trespass, and possession of crack cocaine with intent to distribute, and that in a period of eleven weeks Wilson was charged with ten misdemeanor offenses. *Id.* at *22–24. The jury heard that, as a 15-year-old, Wilson shot a stranger, Jose Valle, in the buttocks because he "wanted to see what it felt like to shoot somebody," and that Wilson sold crack cocaine to Robert Underwood and then shot him five times and "casually walked off." *Id.* at *22–23. The jury also heard testimony that Wilson was charged with cruelty to animals after he "shot and killed a small dog for no apparent reason." *Id.* at *23.

The prosecution also presented evidence of Wilson's violence and gang activity. The jury heard that Wilson threatened a neighbor, saying "I'll blow . . . that old bitch's head off"; Wilson committed unprovoked attacks on his schoolmates; and Wilson attacked one of the employees during his incarceration at Claxton Regional Youth Development Center. *Id.* at *22–23. The jury heard details of an incident in which a "belligerent" Wilson and five others were shouting at students in a parking lot at Georgia College. *Id.* at *23. When police arrived, Wilson rushed one of the officers and had to be subdued with pepper spray when he attempted to grab the officer's gun. *Id.* The jury heard portions of Wilson's post-arrest interrogation in which he confessed that he was the "God damn chief

enforcer" of the Milledgeville FOLKS gang, a rank he achieved by "fighting and stuff like that." *Id.* at \*24.

At the close of testimony, the trial court instructed the jury to consider all of the evidence from both the guilt and penalty phases of trial. After deliberating for less than two hours, the jury sentenced Wilson to death for the crime of malice murder. *Id.* at \*26. The Supreme Court of Georgia affirmed Wilson's conviction and sentence on direct appeal. *Id.* at \*2.

### B. Wilson Petitions for a Writ of Habeas Corpus and Introduces Mitigation Evidence that His Trial Counsel Failed to Present.

Wilson filed a petition for a writ of habeas corpus in a state court, in which he argued that his trial counsel had been ineffective because they failed to investigate his background thoroughly and to present adequate mitigation evidence at his sentencing. *Id.* at \*13; *see Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984). Wilson argued that effective counsel would have interviewed teachers, social workers, and relatives to find mitigation evidence from Wilson's childhood. *Wilson*, 2013 WL 6795024, at \*13. He argued that sufficient counsel would have discovered the names of potential witnesses in the records that his trial counsel possessed but never read. *Id.* at \*15.

At an evidentiary hearing, Wilson's trial counsel testified that they were "confus[ed]" about who was responsible for investigating Wilson's background. *Id.* at \*12. Lead counsel O'Donnell testified that he told Carr and an investigator,

William Thrasher, to "go out and investigate [Wilson's] background." *Id.* at *17. But Carr testified that he "was not involved in as much of the mitigation stage" because he believed O'Donnell was responsible for the investigation. *Id.* at *11. Thrasher testified that he was not "directed to conduct [an] investigation into . . . Wilson's life history for mitigating information." *Id.* at *12.

Wilson introduced evidence that the social services, school, and medical records in the possession of Wilson's trial counsel contained mitigating information about Wilson's childhood homes and physical abuse by parental figures, and names of potential mitigation witnesses. *Id.* at *17–18. Trial counsel failed to explore any of the potential leads or witnesses found in the records. *Id.* at *17. Trial counsel testified that they relied on Kohanski to read the records and construct a social history of Wilson's life. They also testified that they were aware of the information in Wilson's records, but they made the strategic decision to focus on residual doubt instead of bringing in that evidence because it "would basically convince the jury that [Wilson] probably was the trigger man."

Wilson introduced 127 exhibits and 9 witnesses that were either directly from or referenced in the records, or could have been discovered through investigation of references in the records. *Id.* at *26. Wilson introduced lay testimony from his former teachers, family members, friends, and social workers.

*Id.* at \*26–29. He also introduced expert testimony from neuropsychologist Dr. Jorge Herrera and Kohanski. *Id.* at \*29–30.

Wilson argued that the lay testimony could have been used to explain Wilson's disruptive childhood behavior and portray Wilson as someone who never stood a chance. Teachers testified that Wilson was a "tender and good" boy who "had a lot of potential" and "loved being hugged," and that if Wilson had "been afforded appropriate treatment, attention, guidance, supervision[,] and discipline in his early years, there is a good chance" he would not be on death row. Family members and friends testified that some of Wilson's childhood homes lacked running water and electricity and were littered with containers full of urine. *Id.* at \*26. They also testified that Cox's live-in boyfriends "slapp[ed]," "punch[ed]," and "once pulled a knife on" Wilson and that, for a period of a few months, Wilson and Cox lived with Cox's father, who beat Wilson with a belt. *Id.* at \*29. Social workers testified that Wilson's young life included every "risk factor" they could think of, *id.* at \*28, and that Wilson responded well to structure but his childhood was entirely unstructured, *id.* at \*27.

Wilson argued that the expert testimony could have been used to explain Wilson's poor judgment skills and lack of impulse control. Herrera testified that his neuropsychological testing found that Wilson had "mild to severe impairments in brain function[], with severe impairment localized in the frontal lobes." *Id.* at

*30. Herrera opined that "Wilson's association with [Butts] on the night of the crime and his failure to intervene at the time is consistent with the concrete thinking and judgment problems associated" with Wilson's brain injuries. Kohanski confirmed Herrera's assessment and testified that Herrera's testing should have been performed before Wilson's trial. *Id.* at *30. Kohanski testified that Wilson's frontal lobe injuries "indicate[] that [he] . . . is a highly suggestible individual, easily led by others in certain situations."

The state trial court ruled that Wilson did not receive ineffective assistance of counsel. The state trial court ruled that trial counsel's performance was not deficient and, alternatively, that Wilson suffered no prejudice. *Wilson*, 2013 WL 6795024, at *31. Wilson filed an application for certificate of probable cause to appeal the denial of his petition, which the Supreme Court of Georgia summarily denied.

Wilson petitioned for a writ of habeas corpus in the district court, which denied him relief. The district court ruled that the decision of the state trial court as to prejudice did not involve an unreasonable application of clearly established federal law and that the material findings of fact were reasonable. *Id.* at *38. The district court granted Wilson a certificate of appealability.

## II.    STANDARD OF REVIEW

We review *de novo* the denial of a petition for a writ of habeas corpus. *Fotopoulos v. Sec'y, Dep't of Corr.*, 516 F.3d 1229, 1232 (11th Cir. 2008). "Under [the Antiterrorism and Effective Death Penalty Act of 1996], a federal court may not grant a habeas corpus application 'with respect to any claim that was adjudicated on the merits in State court proceedings,' 28 U.S.C. § 2254(d), unless the state court's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,' § 2254(d)(1)." *Johnson v. Upton*, 615 F.3d 1318, 1329 (11th Cir. 2010) (quoting *Berghuis v. Thompkins*, 560 U.S. __, 130 S. Ct. 2250, 2259 (2010)). "[T]his standard [is] 'a highly deferential' one that 'demands that state-court decisions be given the benefit of the doubt.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 130 S. Ct. 1855, 1862 (2010)). The decision of a state court is "contrary to" federal law only if it "contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts." *Cummings v. Sec'y for Dep't of Corr.*, 588 F.3d 1331, 1355 (11th Cir. 2009) (internal quotation marks and citation omitted). The decision of a state is an "unreasonable application" of federal law if it "identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner's case,

11

unreasonably extends the principle to a new context where it should not apply, or unreasonably refuses to extend it to a new context where it should apply." *Id.* "The question under [the Act] is not whether a federal court believes the state court's determination was correct but whether that determination was unreasonable—a substantially higher threshold." *Id.* (internal quotation marks and citation omitted).

"[A]n unreasonable application of federal law is different from an incorrect application of federal law." *Harrington v. Richter*, 562 U.S. 86, __, 131 S. Ct. 770, 785 (2011) (internal quotation marks and citation omitted) (emphasis omitted). "To obtain habeas relief 'a state prisoner must show that the state court's ruling on the claim being presented in the federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1286 (11th Cir. 2012) (quoting *Harrington*, 131 S. Ct. at 786–87). When we evaluate a petition of a state prisoner, we "'must determine what arguments or theories supported or, [if none were stated], could have supported[] the state court's decision; and then [we] must ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court].'" *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1326 (11th Cir. 2013) (en banc) (alterations in original) (quoting *Reese*, 675 F.3d at 1286–87).

12

## III.   DISCUSSION

As an initial matter, the one-line decision of the Supreme Court of Georgia denying Wilson's certificate of probable cause is the relevant state-court decision for our review because it is the final decision "on the merits." *Newland v. Hall*, 527 F.3d 1162, 1199 (11th Cir. 2008); *see also Jones v. GDPC Warden*, 753 F.3d 1171, 1182 (11th Cir. 2014). Instead of deferring to the reasoning of the state trial court, we ask whether there was any "reasonable basis for the [Supreme Court of Georgia] to deny relief." *Harrington*, 131 S. Ct. at 784.

Wilson argues that his trial counsel were ineffective because they failed to investigate his background and present mitigation evidence at his sentencing. To obtain relief, Wilson must establish both that his trial counsel's "performance was deficient, and that the deficiency prejudiced [his] defense." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 2529 (2003). Unless he establishes both requirements, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. And "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* at 697, 104 S. Ct. at 2069.

To establish prejudice, Wilson had to prove "that [his] counsel's errors were so serious as to deprive [him] of a fair trial." *Id.* at 687, 104 S. Ct. at 2064. Wilson

13

challenged his trial counsel's performance during the penalty phase of his trial, so he had to establish that "there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S. Ct. at 2069. To decide whether there is a reasonable probability of a different result, "we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41, 130 S. Ct. 447, 453–54 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98, 120 S. Ct. 1495, 1515 (2000)) (alteration in original).

The Supreme Court of Georgia could have reasonably concluded that Wilson failed to establish that he was prejudiced. The Supreme Court of Georgia could have reasonably concluded that Wilson's new evidence would not have changed the overall mix of evidence at his trial. His new evidence presented a "double-edged sword," *Evans*, 703 F.3d at 1324, and was "largely cumulative" of evidence trial counsel presented to the jury, *Holsey v. Warden, Ga. Diag. Prison*, 694 F.3d 1230, 1260–61 (11th Cir. 2012).

The Supreme Court of Georgia could have reasonably concluded that the balance of the evidence at Wilson's trial would have been unaffected by the new

14

lay testimony. The teachers' testimony might have "humanized" Wilson, and other lay witnesses' testimony might have offered more detailed accounts of Wilson's home life, but that testimony was a "double-edged sword." *Evans*, 703 F.3d at 1324. The teachers' "mitigation" testimony would have also revealed that Wilson was "disruptive" in school, and the social service workers' "mitigation" testimony would have added that one of the investigations into Wilson's home life was terminated prematurely because Wilson was incarcerated.

The lay witness' testimony would have been undermined by other new evidence that "almost certainly would have come in with [the new lay testimony]." *Wong v. Belmontes*, 558 U.S. 15, 20, 130 S. Ct. 383, 386 (2009). Reports in Wilson's school records stated that Wilson had an "'I don't care' attitude," and that he was physically and verbally aggressive to teachers and students, lacked self-control, and blamed others for his misconduct. A report from the Department of Family and Children Services recommended that Wilson remain in his mother's care, and a representative from the Department testified that the Department would "certainly not" have made that recommendation if the home had been unsafe or Wilson had been deprived of food or necessities. And the lay witnesses' testimony that Wilson was physically abused and neglected would have been undermined by the witnesses' uncertainty, Wilson's repeated denials that he was physically abused

15

as a child and school and medical records that described Wilson as "healthy," "clean," "well dressed," "well developed," and "well nourished."

The Supreme Court of Georgia could have reasonably concluded that the balance of the evidence at Wilson's trial also would have been unaffected by the new expert testimony. Herrera assessed Wilson using his own interpretive standards for the neuropsychological tests he administered on Wilson, instead of accepted, authoritative standards. Herrera testified that Wilson's test scores for attention, ability to focus, distractability, and impulsiveness were considered "normal" under the accepted, authoritative standards. Because Herrera recommended against neurological imaging, his conclusion that Wilson had frontal lobe damage was based on only Herrera's unique interpretation of the tests. And the state court could have ruled that Kohanski's new conclusions were unreliable because they were based on Herrera's unreliable results.

Herrera's and Kohanski's expert testimony conflicted with other evidence. They testified that a person with Wilson's test results would be susceptible to suggestion and more of a follower than a leader. But other evidence established that Wilson had risen to the rank of "God damn chief enforcer" of the Milledgeville FOLKS gang and was the "clear leader of the group" during the incident at Georgia College.

16

The Supreme Court of Georgia could have also reasonably concluded that Wilson's new evidence was "largely cumulative" of the evidence trial counsel presented to the jury. *Holsey*, 694 F.3d at 1260–61. The evidence presented at trial and the new evidence "tell the same story," *id.* at 1267, of an unhealthy child, who came from an unstable home and received no parental supervision. The jury heard that, from the age of 9 or 10, Wilson lived on the streets in a difficult neighborhood. His father figures "came and went" and frequently used drugs. One such father figure held a gun to Wilson's mother's head in view of Wilson. Wilson struggled with his identity and joined a gang as a substitute for family. The jury also heard humanizing characteristics, such as Cox's plea to spare Wilson's life for the sake of his 18-month-old daughter, and that Wilson's biological father had no role in Wilson's life. And Kohanski testified that she would have liked to see images of Wilson's brain to confirm that he did not have a brain injury.

The Supreme Court of Georgia could have reasonably concluded that the new evidence "tells a more detailed version of the same story told at trial," *id.* at 1260–61. Wilson's new evidence revealed more details of his difficult background and included additional humanizing stories and speculation about brain damage. The only new revelation at Wilson's evidentiary hearing was that the men in Wilson's life abused him. But the evidence of this abuse "was relatively limited in scope and . . . [not] descripti[ve]." *Id.* at 1282; *cf. Cooper v. Sec'y of Dep't of*

17

*Corr.*, 646 F.3d 1328, 1337, 1349 (11th Cir. 2011). Reasonable jurists could rule that this evidence was "largely cumulative" of the other evidence of Wilson's neglectful childhood. *Holsey*, 694 F.3d at 1260–61.

The Supreme Court of Georgia could have looked at the overall mix of evidence, aggravating and mitigating, old and new, and reasonably determined that a jury would have still sentenced Wilson to death. The jury at Wilson's trial heard a large amount of graphic, aggravating evidence, and it would be reasonable to conclude that Wilson's new evidence was as hurtful as it was helpful, and largely cumulative of the evidence presented at trial. We cannot say that the decision of the Supreme Court of Georgia to deny Wilson's petition was "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1).

## IV.    CONCLUSION

We **AFFIRM** the denial of Wilson's petition for a writ of habeas corpus.

18

ED CARNES, Chief Judge, concurring:

I join all of the Court's opinion but write separately to emphasize how heavily Wilson's criminal history weighs on the aggravating side of the sentencing scale. The weight on that side of the scale is an important factor that must be taken into account in determining whether the failure to present all available mitigating circumstance evidence was prejudicial. See Bobby v. Van Hook, 558 U.S. 4, 11–13, 130 S. Ct. 13, 19–20 (2009); Reed v. Sec'y, Fla. Dep't. of Corr., 593 F.3d 1217, 1240–41 (11th Cir. 2010); Hall v. Head, 310 F.3d 683, 705–06 (11th Cir. 2002).

There is nothing inaccurate in the Court's two-paragraph summary of the evidence that the jury heard about Wilson's history of criminal behavior. Still, the district court's more detailed and chronological recounting of that history, drawn from the evidence presented to the jury at sentencing, is worth quoting. It shows how continuously and relentlessly anti-social and violent Wilson was, beginning with his commission of arson when he was 12 years old and culminating in capital murder seven years later:

> The State's 22 witnesses in the sentencing phase of Wilson's trial testified regarding Wilson's lengthy criminal history and gang affiliation. The jury heard Wilson [D.O.B. July 29, 1976] started committing serious felonies when he was twelve and since then was "either out committing crimes or . . . incarcerated somewhere."

19

On January 31, 1989, twelve-year-old Wilson and two other boys started a fire in a vacant duplex apartment in Glynn County. The residents of the attached unit were home at the time. All three boys were charged with first degree arson and criminal trespass.

John J. Schrier testified he and his mother lived next door to Wilson in Glynn County in 1989. After Schrier's mother, an elderly heart patient, complained that [twelve- or thirteen-year-old] Wilson was harassing her and her dogs, Schrier asked Wilson to leave his mother and her dogs alone. Wilson responded, "I'll blow you and that old bitch's head off."

Former McIntosh County Sheriff's Deputy Robert Wayne Hoyt testified that on December 16, 1991, fifteen-year-old Wilson shot Jose Luis Valle, a Mexican migrant worker. Brian Keith Glover testified he and his two cousins were with Wilson the night he shot Valle. According to Glover, they were standing in the parking lot of a convenience store when Valle, a stranger to them all, walked past and into the store. Wilson announced he was going to rob Valle and that he "wanted to see what it felt like to shoot somebody." Wilson, who had a pistol, approached Valle as he left the store. When Valle raised his arms in the air and turned to run, Wilson shot him in the buttocks. Glover testified that approximately one week after the incident, Wilson, who was again carrying a gun, threatened him because of the statement Glover gave law enforcement about Valle's shooting. Glover's cousin, Oscar Woods, corroborated Glover's story. The charges against Wilson were dead-docketed because the authorities were unable to locate Valle after he was discharged from the hospital.

After Wilson was charged with shooting Valle, he was incarcerated at the Claxton Regional Youth Development Center ("Claxton RYDC"), where he attacked Steve Nesmith, a youth development worker. Nesmith testified Wilson assaulted him, kneed him in the groin, grabbed his legs, and shoved him into a steel door. After a struggle, another worker and a detainee helped Nesmith subdue Wilson. Nesmith testified that during the two years he worked at the Claxton RYDC, Wilson was the only detainee who ever attacked him.

Daniel Rowe testified he attended school with Wilson. In January 1993, [sixteen-year-old] Wilson and another boy attacked him at school as he was drinking from a water fountain. Later the same day, the two again attacked him.

Corporal Craig Brown of the Glynn County Police Department testified that on June 9, 1993 [sixteen-year-old] Wilson shot and killed a small dog for no apparent reason. Juvenile Court Administrator Phillip Corbitt testified Wilson was charged with cruelty to animals and, at a June 25, 1993 arraignment, admitted shooting the dog.

On June 10, 1993, the day after he was charged with shooting the dog, Wilson was charged with possession of crack cocaine with intent to distribute.

A little more than one month later [and three days shy of his seventeenth birthday], Wilson shot Robert Loy Underwood. Underwood testified that on July 26, 1993 he drove into a neighborhood to look for day labor. While there, he purchased crack cocaine from two boys. As he drove away, something struck him in the head. When he turned to see what had hit him, he saw Wilson,

21

who was pointing a pistol at him. Wilson then shot five times into the cab of Underwood's truck. One bullet struck Underwood in the head; another traveled through his arm and lung before lodging in his spine. Underwood said Wilson then "turned around and just casually walked off." Underwood was hospitalized for six days. Wilson was charged with the shooting, and Underwood identified Wilson as the shooter during the juvenile proceedings.

Detective Ted McDonald with the Glynn County Police Department testified Wilson gave a statement in which he claimed he acted in self-defense when he shot Underwood. However, according to McDonald, Underwood's wounds were not consistent with Wilson's claims of self-defense. Juvenile Court Administrator Corbitt testified Wilson admitted shooting Underwood during a juvenile court hearing.

Sergeant Brandon Lee, an officer with the Georgia College Department of Public Safety in Milledgeville, testified that on May 25, 1995, not quite two months after Wilson's release from the Milledgeville YDC, he found [eighteen-year-old] Wilson and five others in a Georgia College parking lot shouting at college students. When Lee asked them to leave the campus, Wilson, whom Lee described as the obvious leader of the group, became belligerent. The group then moved to another parking lot two blocks away where they got involved in another verbal confrontation with students. When campus police arrived and again asked the group to leave the campus, Wilson began shouting "gang language" in Lee's face and refused to leave. As Lee tried to place Wilson under arrest, Wilson charged another officer and attempted to grab the officer's handgun. A

22

struggle ensued, and Wilson ultimately had to be pepper sprayed. After the confrontation, Wilson was arrested and charged with failure to leave campus as directed by an officer and felony obstruction of an officer. Wilson pled guilty to the charges and was banned from the campus.

Steven Roberts, formerly a law enforcement officer with the Georgia College Department of Public Safety, testified that on August 1, 1995, Wilson [who had just turned nineteen] was charged with driving the wrong way on a one-way street and, because he ran when officers approached his car, obstruction of an officer. Roberts also testified he saw Wilson on the Georgia College campus on September 28, 1995. Knowing he had been banned from the campus, Roberts approached [nineteen-year-old] Wilson to arrest him for trespassing. When instructed to place his hands on the car, Wilson ran.

Maxine Blackwell, Solicitor of Baldwin County State Court, testified Wilson had been charged with approximately ten misdemeanor offenses during an eleven week period in 1995 and was sentenced to serve 60 to 120 days in a detention center.

(Bracketed material added; citations to record and footnotes omitted.)

Wilson's wholehearted commitment to antisocial and violent conduct from the age of 12 on not only serves as a heavy weight on the aggravating side of the scale, it also renders essentially worthless some of the newly proffered mitigating circumstance evidence. For example, a number of Wilson's teachers signed affidavits, carefully crafted by his present counsel, claiming that Wilson was "a

23

sweet, sweet boy with so much potential," a "very likeable child," who was "creative and intelligent," and had a "tender and good side."  One even said that Wilson "loved being hugged."  A sweet, sensitive, tender, and hug-seeking youth does not commit arson, kill a helpless dog, respond to a son's plea to quit harassing his elderly mother with a threat "to blow . . . that old bitch's head off," shoot a migrant worker just because he "wanted to see what it felt like to shoot someone," assault a youth detention official, shoot another man in the head and just casually walk off — all before he was old enough to vote.

Without provocation Wilson shot a human being when he was fifteen, shot a second one when he was sixteen, and robbed and shot to death a third one when he was nineteen.  Those shootings and his other crimes belie the story that his present counsel put forward in the affidavits from his former teachers, which are part of the new mitigating circumstance evidence.  See Bobby v. Van Hook, 558 U.S. 4, 12, 130 S.Ct. 13, 19 (2009) ("[T]he affidavits submitted by the witnesses not interviewed shows their testimony would have added nothing of value.').

Given Wilson's lifelong commitment to violent crime, and his utter indifference to human life, reasonable jurists could easily conclude, as the Florida Supreme Court did, that there is no reasonable probability of a different result if his trial counsel had discovered and presented the additional mitigating circumstance evidence that he claims they should have.

24